REL:09/19/2014

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0649), of any typographical or other errors, in order that corrections may be made before the opinion is printed in **Southern Reporter**.

# SUPREME COURT OF ALABAMA

## SPECIAL TERM, 2014

—————————————

### 1130486

—————————————

**Edward S. Ferguson V**

**v.**

**Katina Helen Hawe Critopoulos**

**Appeal from Mobile Probate Court**
**(No. 12-2556)**

BOLIN, Justice.

Edward S. Ferguson V (hereinafter referred to as "Tiger") appeals from the probate court's judgment awarding an omitted-spouse share of his stepfather's estate to Katina Helen Hawe Critopoulos.

Dimitrios Critopoulos (hereinafter "the decedent") died on July 15, 2012. The decedent had no children. His parents predeceased him, and he had no siblings. At the time of his death, the decedent was married to Katina. The couple had wed less than a year earlier on August 20, 2011. The decedent had a valid will at the time of his death, but the will, which was executed prior to their marriage, made no provision for Katina.

The decedent's first wife, Dorothy Marie Hayes Critopoulos, had been married to the decedent for 35 years when she predeceased him in 2009. Dorothy had three children from a prior marriage: Crystal M. Hanawalt, Tiger, and Timothy D. Ferguson ("Tim"). Although the decedent did not adopt Crystal, Tiger, and Tim, it is undisputed that the three enjoyed a parent-child relationship with the decedent. Crystal, Tiger, and Tim were named as the residual legatees under the decedent's will.

On December 18, 2012, Tiger filed a petition to probate the decedent's will in Mobile County. The executrix named in the decedent's will was Dorothy, and Crystal was named the successor. Crystal declined appointment. The general

administrator for Mobile County was then appointed to represent the decedent's estate.

On April 9, 2013, Katina filed a petition for an omitted-spouse share of the decedent's estate pursuant to § 43-8-90, Ala. Code 1975.  On May 29, 2013, Crystal, Tiger, and Tim filed a response to Katina's petition, in which they asserted that the decedent had provided for Katina outside the will and that, therefore, Katina was not entitled to an omitted-spouse share under § 43-8-90(a).  The probate court held a bench trial, and on December 23, 2013, it entered the following order:

> "This cause came before the Court on October 16 and 17, 2013 on the Petition for Omitted Spouse Share filed by Katina Helen Hawe Critopoulos ('Katina') and the Answer and Response to Petition for Omitted Spouse's Share filed by Crystal M. Hanawalt ('Crystal') and Edward S. Ferguson, [V] ('Tiger')....

> "The Decedent, Dimitrios P. 'Jim' Critopoulos ('Decedent'), was born on November 1, 1952 in Greece. The Decedent died in Mobile County, Alabama, on July 15, 2012.  The Decedent was 52 years old at the time of his death. By all accounts, the Decedent's death was not expected. At the time of his death the Decedent was employed by the United States Department of Labor - OSHA Division.

> "The Decedent had no children. The Decedent's parents predeceased the Decedent. The Decedent had no siblings. At the time of his death the Decedent

was married to Katina. They were married on August 20, 2011. Consequently, the Decedent and Katina were married to each other for approximately 9 months.

"The Decedent was married for many years to Dorothy Marie Hayes Critopoulos ('Dorothy'). Dorothy died on July 28, 2009. Dorothy was also survived by three children, from a relationship preceding her relationship with the Decedent, namely: Crystal, Tiger, and Timothy D. Ferguson ('Tim'). Crystal, Tiger, and Tim are all living. It is undisputed that Crystal, Tiger, and Tim enjoyed a parent-child relationship with the Decedent both before Dorothy's death and after Dorothy's death. However, the Decedent's relationship with Tim was strained at the time of the Decedent's death. The Decedent did not adopt Crystal, Tiger, and Tim.

"The Decedent owned two residences at the time of his death: (1) the residence located [on] Baratara Drive in Chickasaw ('Baratara Property'), and (2) the residence located [on] East Third Street in Chickasaw ('Third Street Property'). The Decedent and Katina resided in the Baratara Property at the time of the Decedent's death and Tim resided in the Third Street Property.

"It is undisputed that the Decedent was contemplating the formulation and execution of a new last will and testament at the time of the Decedent's death. A new last will and testament was not finalized because of the Decedent's indecision about the Third Street Property and matters relating to Tim. It is also noteworthy that all of the parties agree that the Decedent was an intelligent person.

"Katina returned to California after the Decedent's death. Katina currently resides in California.

"Decedent's Last Will and Testament

4

"On September 27, 2002, the Decedent made and published his last will and testament ('Will'). The Will was admitted to probate by the Court on February 4, 2013. Frank H. Kruse, Esq. ('Kruse'), General Administrator for Mobile County, was appointed as the personal representative of the Decedent's estate. Letters of Administration on the Annexed Will were issued to Kruse on March 1, 2013.

"The Will provides in pertinent part as follows:

"'FOUR

"'Provided that she survive me, I GIVE, DEVISE and BEQUEATH my residential homeplace, (including the contents and furnishings therein), all real property wheresoever situated, all motor vehicles (including any automobiles, trucks, boats, all terrain vehicles), and all cash assets (including but not limited to stocks, bonds, certificates of deposits, individual retirement accounts, thrift accounts, savings accounts, checking accounts, and cash on hand) to my wife, DOROTHY MARIE CRITOPOULOS.

"'FIVE

"In the event that my wife, DOROTHY MARIE CRITOPOULOS, shall not survive me, then to my stepchildren, namely, CRYSTAL MARIE COLLINS, EDWARD S. FERGUSON, [V], AND TIMOTHY D. FERGUSON, I give, devise and bequeath the following: my residential homeplace, (including the contents and furnishings therein), all real property wheresoever situated, all motor vehicles (including any automobiles, trucks, boats, all terrain vehicles), and all cash assets (including but not limited to stocks, bonds, certificates of deposits, individual

retirement accounts, thrift accounts, savings accounts, checking accounts, and cash on hand) in equal shares to share and share alike; if any of my stepchildren predecease me, their share shall go to their children per stirpes.

"'In order for a designated beneficiary to be deemed to have survived me, said person must survive me by more than thirty (30) days.'

"<u>Decedent's Relationship With Katina</u>

"The Decedent first met Katina during Dorothy's lifetime. It is undisputed that, approximately 12 years prior to his death, the Decedent had a romantic extramarital relationship with Katina, while the Decedent was married to Dorothy. No testimony was presented as to whether Dorothy was aware of the Decedent's relationship with Katina. Tiger and Crystal didn't learn of the relationship until Katina moved to Mobile.

"The Decedent and Katina had contact with each other following Dorothy's death. Katina came from California to Mobile, Alabama, with all of her personal belongings in her suitcase. The Decedent purchased Katina's airline ticket to travel from California to Mobile. According to Bryan Robert Smith-Angel ('Smith'), the Decedent's best friend, Katina told the Decedent that Katina would not come to Mobile unless they got married.

"The Decedent considered having a prenuptial contract with Katina and deliberately chose not to pursue such. The Decedent and Katina married on August 20, 2011. During the marriage the Decedent purchased a motor vehicle for Katina. The Decedent also paid the apartment rental for Katina's daughter, who resided in California after Katina moved to Mobile.

"<u>Decedent's Estate</u>

"As noted earlier, the Decedent was gainfully employed in the United States Civil Service at the time of the Decedent's death. At the time of his death, the Decedent owned the following property with the indicated estimated value:

| "<u>Property</u> | <u>Estimated Value</u> |
|---|---|
| "Baratara Property | $152,500.00 |
| "Third Street Property | 80,500.00 |
| "'Greek Bonds' held by HSBC | unknown[1] |
| "U.S. Savings Bonds | 16,700.00 |
| "Regions Bank account | 89,342.81 |
| "Money Concepts Account | 45,000.00 plus[2] |
| "E-Trade Account | transferred to estate account (Regions) |
| "Thrift Savings Plan | Approximately $422,170.00[3] |
| "Household items, furniture and furnishings at Baratara Property | $6,280.00[4] |
| "Fine jewelry | $4,671.00 |
| "Watches | $687.00 |
| "Firearms | $4,000.00[5] |

"2007 Chevrolet Tahoe                    $23,500.00
      [sport-utility vehicle]

"Excluding the value of the Thrift Savings Plan and the Money Concepts Account, the value of the Decedent's estate at the time of the Decedent's death was approximately $378,200. Of said amount, $233,000 is attributed to the estimated value of two residences. The real estate market in the Mobile area has been and remains depressed. The real estate holdings comprise 61.6 percent of the Decedent's total estate.

"Additionally, the Decedent had the following life insurance policies:

"<u>Policy</u>                          <u>Estimated Value</u>

"FEGLl (administered       approx. $ 542,200.00[6]
by MetLife)

"Army Aviation Center FCU            $2,061.78[7]

"ASC                                 $100,000.00[8]

"Finally, the Decedent maintained a 'trust account' for one of Crystal's daughters, which had approximately $8,000 at the time of the Decedent's death.

"<u>Katina's Separate Estate at Time of Marriage</u>

"At the time of Katina's marriage to the Decedent, Katina had no savings and was 'working paycheck to paycheck.' Further, Katina owned no real estate. Several months before the Decedent died, Katina worked. Katina had a separate checking account.

"<u>What Katina Has Received as a Result of the Death of the Decedent</u>

8

"At the time of the Decedent's death, the Decedent and Katina had a joint checking account with rights of survivorship. Katina also had a separate checking account. Katina received the funds in these checking accounts. The Decedent executed the appropriate documentation prior to his death to facilitate Katina receiving: (1) a share ($211,084.85) of the Decedent's 'Thrift Savings Plan' benefits; (2) fifty (50%) share ($271,101.02) of the Decedent's life insurance benefits (through the 'FEGLI' program administered by MetLife); (3) $75,517.98 of lump sum death benefits (reduced approximately $ 15,000.00 for anticipated federal taxes); and (4) $ 2,061.78 of life insurance through the Army Aviation Center Federal Credit Union. Katina also received $3,325.59 from the United States Government (the Decedent's employer) for unpaid compensation due the Decedent. Finally, Katina receives a monthly stipend of $532.37 as the Decedent's surviving spouse. The lump sum payments to Katina total $548,091.22.

"What Dorothy's Children Have Received as a Result of the Death of the Decedent

"Crystal and Tiger each received 25 percent shares of the Decedent's Thrift Savings Plan and life insurance benefits (through the 'FEGLI' program administered by MetLife). Tiger and Crystal were also the death beneficiaries of the Money Concepts Account. Tiger, Crystal, and Tim were the named beneficiaries of the ASC insurance policy. Tiger testified that Tiger had received the policy assets as a result of the Decedent's death:

"Thrift Savings -  $105,542.42

"FEGLI (MetLife) -  $135,550.51

"Money Concepts -   $45,000.00

"ASC Insurance Policy - 1/3 of $100,000

9

"Altogether, Dorothy's children have collectively received approximately $672,186.00 a result of the Decedent's death.[9]

"<u>Decedent's Comments Regarding Disposition of Decedent's Estate</u>

"When Dorothy died, title to most, if not all, of the Decedent's and Dorothy's assets were held joint with rights of survivorship or in one of the spouse's name with the other spouse individual as the beneficiary upon death. The Decedent was the beneficiary of Dorothy's individual retirement account, with Dorothy's children named as contingent beneficiaries. The Decedent received the assets of Dorothy's individual retirement account upon Dorothy's death.

"Tiger testified that the Decedent told Tiger before the Decedent and Katina married that: (1) the Decedent and Katina planned to get married, (2) any property the Decedent acquired before his marriage to Katina would be devised by the Decedent to Tiger, Crystal, and Tim upon the Decedent's death, and (3) any property the Decedent acquired after his marriage to Katina would be devised to Katina. After the Decedent married Katina, Tiger's relationship with the Decedent continued. There were periodic visits. According to Tiger, on one such visit the Decedent told Tiger that the Decedent intended to make financial provisions for Katina, although he (the Decedent) did not know how he would do so.

"Smith testified that the Decedent told Smith that he (the Decedent) planned to formulate a new last will and testament that would provide for Katina, Tiger, and Crystal. According to Smith the Decedent wanted to provide for Katina because 'she was his wife and he loved her.'

"Smith testified that approximately three to five months preceding the Decedent's death the

Decedent and Smith had a conversation about a new estate plan the Decedent proposed formulating. Smith testified that in said conversation the Decedent stated that the Decedent wanted to: (1) devise the Baratara Property to Katina; (2) devise the Third Avenue residence to Tiger and Crystal (in order to afford Tim a place to reside in fulfillment of a promise the Decedent made to Dorothy before her death); (3) name Katina as the beneficiary of an existing life insurance policy where Dorothy was the named beneficiary; and (4) name Katina, Tiger, and Crystal as the beneficiaries of the Decedent's 'government life insurance' and other life insurance on the Decedent's life. Smith testified that he told the Decedent that he (Smith) objected to the Decedent's proposal, saying 'you can't do that to the kids -- you need to split the property equally amongst them.'

"Crystal and the Decedent conversed about a month prior to the Decedent marrying Katina, and the Decedent stated that Katina was not interested in the Decedent's money. Crystal also testified that following the Decedent's marriage to Katina, Crystal and the Decedent spoke several times regarding the Third Street residence. Crystal testified that the Decedent told Crystal that the Decedent had promised Dorothy that Tim would have a place to live. The Decedent was afraid that Tim would lose the Third Street residence if it was deeded outright to Tim and the Decedent wanted to give the house to Crystal with the understanding that Tim could reside in the residence. Crystal further testified that she objected to the Decedent devising the Third Street residence to Crystal because she did not want the responsibility. Crystal testified that she had no discussions with the Decedent regarding the Decedent's other assets. Finally, about a month before the Decedent died, Crystal testified that the Decedent told Crystal with reference to Katina that 'I will make sure she's taken care of if something happens to me.'

"Katina testified that the Decedent told her that upon his death the Decedent desired: (1) Katina receive the Baratara Property; (2) Tiger and Crystal receive the Third Street Property, with Tim continuing to reside in said residence; (3) other financial arrangements would be made to provide compensation to Tiger and Crystal because Dorothy had lived in and helped acquire the Baratara Property; and (4) all of the Decedent's remaining assets with the exception of various firearms and household furnishings and personal property purchased prior to the Decedent and Katina being married, would be devised to Katina.

"<u>Events Following Decedent's Death</u>

"There was electronic mail ('e-mail') dialogue between Katina and Crystal following the Decedent's death regarding the disposition of the Decedent's estate. In an e-mail message dated August 11, 2012 (approximately one month following the Decedent's death), Katina related to Crystal that she (Katina) knew 'Jim's [the Decedent] wishes ... and I'm willing to execute them. This way I can be the "fall guy" with Tim and it not interfere with your sibling relationship.' This e-mail message was sent days before Katina and Tiger met with Charles Hicks ('Hicks'), a lawyer in Mobile, Alabama.

"Hicks met with Katina on four (4) or five (5) occasions to discuss the Will. Katina, Tiger, and Smith were physically present at the initial meeting and Crystal participated by telephone. At the initial meeting, the persons present discussed the Decedent's intentions and wishes. At said meeting Katina indicated that the Decedent wanted the bulk of his estate to go to Katina, Crystal, and Tiger. Katina further indicated that the Decedent had had a falling out with his other stepson (by deduction this was Tim). Katina stated that the Decedent's wishes were for Tim to receive nothing of the Decedent's estate.

12

"At the meeting with Hicks, the parties attempted to reach an agreement regarding the distribution of the Decedent's assets in a manner that differed from the provisions of the Will (Tim would receive less than the others). Hicks testified that the parties recognized that any agreement to distribute the Decedent's assets in a manner different from what the Will provided would require Tim's agreement. Hicks prepared and filed with the Court the petition to probate the Will. As noted above, the Will was admitted to probate without objection. There were several follow-up conversations between Hicks and Katina and Tiger. The parties could not reach an agreement. Based upon comments made in the subsequent conversations, Hicks determined that he had a conflict of interest and Hicks withdrew from representation of any party in interest in this cause.

"In a document dated February 1, 2013, that was presented to Tiger and Crystal, Katina stated that she expected the following:

"1. 50 percent of the following assets:

"A.  Baratara Property
"B.  Third Street Property
"C.  U.S. Savings Bonds
"D.  All accounts administered by Money Concepts
"E.  Scottrade accounts
"F.  E Trade accounts
"G.  2007 Chevy Tahoe
"H.  All accounts held at HSBC in Greece

"2.  One firearm the Decedent purchased shortly before his death

"3.  The household furnishings purchased while the Decedent and Katina were a couple (identified as the living room furniture, informal dining set, bed, television, wedding gifts, and Greek language recordings).

"<u>Posture of Decedent's Estate Proceeding</u>

"On April 9, 2013, Katina filed her 'Petition for an Omitted Spouse's Share Pursuant to Ala. Code 1975 § 43-8-90, or, in the Alternative for Further Relief.' In her prayer for relief Katina requested that the Court determine that Katina was the Decedent's omitted spouse. Alternatively, Katina requested that the Court award Katina her elective share pursuant to Ala. Code 1975, § 43-8-70, and the allowance provided in Ala. Code 1975, §§ 43-8-110, 111 and 112. Later, Katina withdrew her request for an elective share.

"_____

"[1]The parties apparently all agree that the value of the Greek bonds is questionable.

"[2]This account was payable on death to Tiger and Crystal. Tiger testified that he had received $45,000 as a result of this asset. The amount Crystal received is unknown.

"[3]The pay-on-death beneficiaries of the Plan were Katina (50 percent), Tiger (25 percent) and Crystal (25 percent).

"[4]According to her February 1, 2013, statement (see below), Katina has possession of the living room furniture, informal dining set, bed, television, wedding gifts and Greek language recordings that were in the Baratara Property. It is uncertain as to whether these assets are included in the Personal Representative's inventories.

"[5]According to her February 1, 2013, statement, Katina has possession of one firearm (described as being a 'handgun'). It is uncertain as to whether this firearm is included in the Personal Representative's inventories.

14

"[6]The pay-on-death beneficiaries of the policy were Katina (50 percent), Tiger (25 percent) and Crystal (25 percent).

"[7]Katina was the beneficiary of this policy.

"[8]The pay-on-death beneficiaries of the policy were Tiger, Crystal and Tim (one-third each).

"[9]Computation presumes that Crystal also received $45,000 as a result of being a 50 percent death beneficiary of the Money Concepts Account."

The probate court went on to discuss the applicable caselaw regarding § 43-8-90. The probate court listed several points a court is to consider in making omitted-spouse determinations. The probate court noted that § 43-8-90 provides that an omitted spouse shall receive the same share of the estate he or she would have received if the decedent had left no will. The intestate share for a surviving spouse is set out in § 42-8-41, Ala. Code 1975, and the probate court noted that because the decedent had no biological children and no surviving parents, Katina would be entitled to all of the decedent's intestate estate.

The probate court concluded:

"In the instant cause, Tiger and Crystal have the burden of proving that the transfers by the Decedent to or for the benefit of Katina were intended to be in lieu of a testamentary provision. As noted above, an indication of such can be

15

1130486

obtained by comparing the value of the probate estate to the value of the property the respective interested parties have received or will receive. Tiger and Crystal provided such information to the Court. However, the Alabama appellate cases discussed herein and the decisions of other states' appellate courts cited with approval by the Alabama Supreme Court note that there are other factors to be considered as well by a trial court when trying to determine a testator's intent in this type of matter.

"Tiger and Crystal provided no other evidence to support their position that at the time the Decedent made the beneficiary designations that made Katina a beneficiary, the Decedent intended by those designations and actions that Katina receive said benefits in lieu of a testamentary provision.

"Further, the actual documents reflecting the beneficiary designations for the Decedent's Thrift Savings Plan and FEGLI life insurance benefits were not introduced into evidence. Consequently, the Court is unable to consider the timing of said actions by the Decedent in relation to the Decedent's statements to Tiger, Crystal, Smith, and Katina that the Decedent wanted to revise the Will and update his estate plan. There was no testimony that the Decedent told anyone that he was making the beneficiary designations in question that benefited Katina in lieu of a testamentary provision in favor of Katina.

"Testimony was presented that the Decedent considered having a prenuptial contract with Katina and deliberately chose not to pursue such. The deliberate act of not having a prenuptial contract is noteworthy in the instant cause.

"Tiger and Crystal cited Wester [v. Baker, 675 So. 2d 447 (Ala. Civ. App. 1996),] in support of their position. As noted above, in Wester was

16

testimony that the decedent stated to a disinterested person that the decedent was pleased with her last will and testament the way it had been drafted and she would leave it that way. Wester, 615 So. 2d at 448. As noted by Katina, it is clear that in Wester the decedent did not plan to change the decedent's last will and testament. The undisputed testimony in this cause is the exact opposite: (1) the Decedent was not happy with the Will; (2) the Decedent desired to change the Will; and (3) the Decedent was struggling with how to provide for Katina, address his testamentary provision for Tim, and address the Third Street Property.[11]

"The Court is cognizant that: (1) the purpose of the omitted spouse statute is to preserve the remainder of the will, while still providing for the omitted spouse; (2) by ruling that Katina is an omitted spouse, coupled with the provisions of Ala. Code 1975, § 43-8-41, practically speaking, Tiger, Crystal, and Tim will not participate as beneficiaries of the Decedent's probate estate and Katina will be the only beneficiary of the Decedent's probate estate; and (3) Katina will receive more than she acknowledged that the Decedent intended for her to receive upon his death.

"At first blush, this result appears harsh. However, it must be remembered that: (1) surviving spouses are accorded special rights in the law;[12] (2) children of decedents[13] can be and are frequently disinherited by their parents;[14] (3) adult children of a decedent are not accorded any special status in this aspect of probate law; and (4) the Alabama Legislature specifies Alabama's statutory-positive law, not the courts. Notwithstanding such, it must also be noted that Tiger, Crystal, and Tim have all received substantial amounts as a result of the Decedent's death, which the Decedent was not legally required to provide to them. Finally, it must be remembered that this Court (and all courts) make rulings based upon the law, not what a particular

17

person in a position to make a decision likes or considers moral. Because of the facts in this case, Katina will receive more of the Decedent's estate than she acknowledged the Decedent desired for her to receive. Such is a moral matter for Katina to ponder and act as her conscience dictates.

"Upon consideration of demeanor of all of the witnesses, the documentary evidence introduced and applicable law, the Court is of the opinion, for the reasons stated herein, that Tiger and Crystal failed to meet their burden of proving that the transfers by the Decedent to or for the benefit of Katina were intended to be lieu of a testamentary provision.

"Upon consideration of demeanor of all the witnesses, the documentary evidence introduced and applicable law, the Court is of the opinion, for the reasons stated herein, that Katina is an omitted spouse in this cause and that she should be accorded such status in the Decedent's estate.

"_____

"[11]The Court notes that Tim is in possession of the Third Street Property. There was no evidence that the Decedent ever told Tim or any other party in interest that the Decedent was conveying or gifting the Third Street Property to Tim. And there is no specific devise of the Third Street Property to Tim in the Will. Consequently, the Court found no legal bases to rule that Tim now owns the Third Street Property or to declare that Tim would receive the Third Street Property. See also, Ala. Code 1975, §§ 8-9-2 and 35-4-20.

"[12]Surviving spouses' special status is reflected in allowances, exemptions available to them, along with the right to elect against a will or to assert rights as an omitted spouse, as was done by Katina in the instant cause.

18

"[13]In the instant cause it is undisputed that Tiger, Crystal, and Tim are not the Decedent's children. The only basis for their having an interest in the Decedent's estate is their being named beneficiaries in the Will.

"[14]It is very common for married persons with children to provide in their last will and testament that their entire estate will be devised to their surviving spouse upon their death, even if there are children of said marriage. Typically when there is a second spouse and children of a prior relationship, testators make testamentary provisions for their surviving spouse or otherwise they have a prenuptial contract."

Tiger filed a timely appeal.

Standard of Review

Because the probate court received evidence ore tenus, our review is governed by the following principles:

"'"'[W]hen a trial court hears ore tenus testimony, its findings on disputed facts are presumed correct and its judgment based on those findings will not be reversed unless the judgment is palpably erroneous or manifestly unjust.'"' Water Works & Sanitary Sewer Bd. v. Parks, 977 So. 2d 440, 443 (Ala. 2007)(quoting Fadalla v. Fadalla, 929 So. 2d 429, 433 (Ala. 2005), quoting in turn Philpot v. State, 843 So. 2d 122, 125 (Ala. 2002)). '"The presumption of correctness, however, is rebuttable and may be overcome where there is insufficient evidence presented to the trial court to sustain its judgment."' Waltman v. Rowell, 913 So. 2d 1083, 1086 (Ala. 2005)(quoting Dennis v. Dobbs, 474 So. 2d 77, 79 (Ala. 1985)). 'Additionally, the ore tenus rule does not extend to cloak with a presumption of correctness a trial judge's conclusions of law or

19

the incorrect application of law to the facts.'
<u>Waltman v. Rowell</u>, 913 So. 2d at 1086."

<u>Retail Developers of Alabama, LLC v. East Gadsden Golf Club,
Inc.</u>, 985 So. 2d 924, 929 (Ala. 2007).

### Discussion

Section 43-8-90 provides:

"(a) If a testator fails to provide by will for
his surviving spouse who married the testator after
the execution of the will, the omitted spouse shall
receive the same share of the estate he would have
received if the decedent left no will unless it
appears from the will that the omission was
intentional or the testator provided for the spouse
by transfer outside the will and the intent that the
transfer be in lieu of a testamentary provision be
reasonably proven.

"(b) In satisfying a share provided by this
section, the devises made by the will abate as
provided in section 43-8-76[, Ala. Code 1975]."

In <u>Hellums v. Reinhardt</u>, 567 So. 2d 274 (Ala. 1990), this
Court addressed, for the first time, the interpretation of §
43-8-90 and the burden of proof in actions brought pursuant to
the omitted-spouse statute. We recognized that § 43-8-90 was
based upon the Uniform Probate Code ("UPC") drafted by the
National Conference of Commissioners on Uniform State Laws:

"The purpose of § 43-8-90, which is based on UPC
§ 2-301, is to remedy the unintentional
disinheritance of a spouse when the decedent's will
was executed before their marriage. The adoption of

20

that section reflects 'the view that the intestate share of the spouse is what the decedent would want the spouse to have if he had thought about the relationship of his old will to his new situation.' Commentary to § 43-8-90."

567 So. 2d at 277.

The Hellums Court looked to other states that had adopted versions of the UPC's omitted-spouse provision. The Court concluded that the burden of proof that must be met is that once the surviving spouse proves that he or she was omitted from the will, the burden of proof then shifts to the proponent of the will to show that the testator provided for the surviving spouse by inter vivos transfers and that those transfers were intended to be in lieu of a testamentary provision. This interpretation was consistent with the courts in North Dakota and Arizona as set out in In re Estate of Knudsen, 342 N.W.2d 387 (N.D. 1984), and In re Estate of Beaman, 119 Ariz. 614, 583 P.2d 270 (Ariz. Ct. App. 1978), respectively. The Court stated:

"Shifting the burden to the proponent of the will to prove that the testator provided for the spouse outside the will is most consistent with the terms of the statute, which requires that the will make apparent an intent to omit the future spouse or that the testator's intent to substitute an inter vivos transfer for a testamentary provision be reasonably proven."

567 So. 2d at 277. The Court went on to address inter vivos transfers that have been held to be in lieu of testamentary provisions, such as the opening of joint-tenancy checking accounts and savings accounts and the assignment of retirement or insurance benefits as set out in In re Estate of Taggart, 95 N.M. 117, 619 P.2d 562 (N.M. Ct. App. 1980). The Court also noted other transfers that would satisfy this requirement, as set out in Annot., 11 A.L.R. 4th 1213 (1982).

In Hellums, the decedent executed her will on June 29, 1987. She married Hellums on May 20, 1988, and remained married to him until her death on December 1, 1988. No evidence was presented that the decedent gave Hellums any inter vivos gifts, and the decedent's will did not contain any language indicating that the decedent intended to omit a future spouse or restrict a future spouse's inheritance. Holding that the probate court had erred in finding that Hellums was not entitled to an intestate share as an omitted spouse, this Court reversed the judgment.

In Becraft v. Becraft, 628 So. 2d 404 (Ala. 1993), the widow petitioned for an omitted-spouse share of the decedent's estate. The widow showed her eligibility as an omitted spouse

under § 43-8-90 by presenting evidence indicating that she was married to the decedent until his death seven months after the marriage. The decedent had a will at the time of his death. However, that will had been written years earlier and left his entire estate to Barbara, his wife at time the will was executed. The decedent's will also provided that, if Barbara predeceased him, the estate would go their children. It was undisputed that the decedent made the widow the beneficiary of a $25,000 life-insurance policy. The issue was whether the children, as proponents of the will, reasonably proved that the decedent intended the insurance proceeds to be in lieu of a testamentary provision. The probate court concluded that the children had not carried their burden of showing that the insurance policy was given in lieu of a testamentary provision. The children's testimony that the decedent intended his estate to go them was contradicted by the widow's testimony. The probate court also considered the circumstances surrounding the decedent's marriage and death. The probate court also considered the amount of the insurance proceeds and the size of the intestate share. We affirmed the probate court's judgment. We noted that the size of an inter

vivos gift or one that passes outside the estate in relation to the intestate share is relevant to the question whether the gift was intended to be in lieu of a testamentary provision but that there is no requirement that an inter vivos or extra-estate gift be equal to or approximately the same as an intestate share to qualify as a transfer in lieu of a testamentary provision.

In Kellum v. Dutton, 706 So. 2d 1179 (Ala. 1997), the husband filed a petition against his deceased wife's estate, seeking a share as an omitted spouse. In 1988, the wife had executed a will leaving her residual estate to her nephew and his wife. On December 13, 1991, the parties entered into a prenuptial agreement, conditioned upon their future marriage, whereby each waived and released "all rights" to the other's estate. On December 14, 1991, the parties married. In 1994, the wife died. The husband was not entitled to a share of the wife's estate as a surviving spouse omitted from the wife's 1988 will, which predated their marriage. The prenuptial agreement was a vehicle of transfer, outside the will, and constituted sufficient proof of the wife's intent that that

24

inter vivos transfer be in lieu of making provisions for the husband in her will.

The Court of Civil Appeals in Wester v. Baker, 675 So. 2d 447 (Ala. Civ. App. 1996), upheld the probate court's holding that the husband was not entitled to a share as an omitted spouse. The wife had executed a will in 1972, naming her niece as the sole beneficiary and the executrix of her will. The wife married the husband in 1973. In 1974, they purchased real property in joint tenancy with right of survivorship, and they lived on this property. The wife had another parcel of property. The wife died in 1994. The husband petitioned the probate court to receive a share of the wife's estate as an omitted spouse. The niece, as the proponent of the will, presented evidence from one of the wife's sisters indicating that she and the wife had discussed the will about a year before the wife's death and that the wife had helped the husband purchase the house so that he would have a home of his own and so that she would not have to change her will. There was also testimony from the wife's sister-in-law that the wife told her that the husband had been pestering her to change the

will but that she was pleased with the will and would leave it the way it was.

The purpose of § 43-8-90 is to avoid an unintentional disinheritance of the spouse of a testator who had executed a will prior to the parties' marriage. It serves to give effect to the probable intent of the testator and protects the surviving spouse. The operative effect of § 43-8-90 is to carve out an intestate share as a vehicle to carry out the probable intent of the testator and to protect the omitted spouse. Section 43-8-90 goes on to provide two exceptions to allowing an omitted spouse an intestate share: (1) if it appears from the will that the omission of the surviving spouse was intentional or (2) if the testator provided for the surviving spouse with transfers outside the will with the intent that those transfers were in lieu of a provision in the will. If either exception exists, the surviving spouse is not entitled to a share as an omitted spouse.

Based on Hellums and its progeny, and the cases this Court cited in Hellums, we discern the following regarding a determination whether the testator provided for the surviving spouse outside the will: (1) inter vivos transfers that have

been held to be "transfers" in lieu of testamentary provisions include joint-tenancy checking and savings accounts and assignments of retirement or insurance benefits; (2) the size of the inter vivos transfer or a transfer that passes outside the estate in relation to the intestate share may be a relevant comparison, but there is no requirement that the inter vivos or extra-estate gift be approximately the same as the intestate share in order to qualify as a transfer in lieu of a testamentary provision; (3) a valid prenuptial agreement is a "transfer" outside the will and constitutes sufficient proof of intent that that transfer is in lieu of a testamentary provision; (4) statements made by the testator concerning transfers outside the will may be relevant to show the testator's intent that the transfers be in lieu of a testamentary provision; (5) statements made by the testator concerning the old will in relation to the new marriage may be relevant to show that the testator reexamined the will and did not change the will; (6)the separate estate of the surviving spouse may be relevant; (7) the duration of the marriage may be relevant; and (8) the beneficiaries under the will may be relevant.

Because § 43-8-90 is designed to give effect to the probable intent of the testator and to protect the surviving spouse, the above-listed relevant considerations or factors are not exclusive. Other factors may also be considered. The factors relevant in one case may not be relevant in another. These factors are not a mechanical checklist to reasonably prove the testator's intent that the transfer be in lieu of a testamentary provision, because the circumstances and facts vary from case to case in probate proceedings such as this.

With this in mind, we turn to the present case. It is undisputed that the decedent executed his will in 2002 and that he and Katina married in 2011. Nothing in the decedent's will indicates that the omission of Katina from the will was intentional; therefore, the first exception to the omitted-spouse share is not applicable.[1] Now, we must determine whether the probate court correctly held that the second exception was not met, i.e., that Tiger failed to reasonably

---

[1]Section 43-8-90 is based on § 2-301 of the UPC. Since the adoption of § 43-8-90, § 2-301 has been amended to provide for the following exception to the omitted-spouse share: If "it appears from the will or other evidence that the will was made in contemplation of the testator's marriage to the surviving spouse," then the surviving spouse is not entitled to the omitted-spouse share. (Emphasis added.)

prove that the decedent provided for Katina outside the will and that those transfers were in lieu of a testamentary provision.

The decedent died in 2012, without changing his will. The decedent had no children, his parents had predeceased him, and he had no surviving siblings. Because § 43-8-90 provides that an omitted-spouse share is what the omitted spouse would have received if the decedent had had no will, then under the intestate statute, § 43-8-41(1), Ala. Code 1975, Katina would receive the decedent's entire estate. The beneficiaries under the will are Crystal, Tiger, and Tim. It is undisputed that the decedent had a "parent/child" relationship with his stepchildren before Dorothy's death and that he remained close to Crystal and Tiger after Dorothy's death. When Dorothy predeceased the decedent, all of their assets were held jointly with rights of survivorship. The decedent was the beneficiary of Dorothy's retirement accounts.

Katina and the decedent had an affair during the decedent's marriage to Dorothy. Katina refused to come to Alabama unless she and the decedent married. Katina had no separate estate; she was living paycheck to paycheck before

she married the decedent. Katina and the decedent were married for less than a year before his death.

The decedent provided Katina with inter vivos transfers and transfers outside the will, including checking accounts, life insurance, and retirement benefits. Those transfers amount to lump-sum payments totaling approximately $548,000 and a monthly stipend for the rest of her life in the amount of $900 in pension benefits.[2] Crystal, Tiger, and Tim all received inter vivos transfers and transfers outside the will. Crystal and Tiger each received approximately $319,000, and Tim received $33,000. The trial court valued the decedent's probate estate at $378,200 with $233,000 attributed to two residences. The probate court valued the decedent's property located on Baratara Drive at $152,500, although the house actually sold for $77,000 after the decedent's death.

There was testimony that the decedent was considering changing his will after his marriage to Katina. The decedent told Katina and his best friend that he was considering

---

[2]This amount differs from the amount shown by the probate court ($532.37) because the probate court did not include the health-insurance premium that is deducted from the pension benefit.

leaving the property on Third Avenue to Tim to fulfil a promise to Dorothy to provide a house for Tim. The decedent was also considering leaving the property on Baratara Drive to Katina in order for her to have a place to live because she had moved to Alabama to marry the deceased. The decedent could not decide what to do, and he did not change his will. The decedent told Crystal and Katina that he was going to provide for Katina. Although the probate court states that "by all accounts " the decedent died unexpectedly, there was testimony from Crystal that the decedent was sick and had been hiding his illness. There was also testimony from the decedent's best friend that the decedent was on oxygen the last few months of his life.

The probate court focuses on the fact that the decedent never stated that the transfers he made to Katina were in lieu of changing his will. Although such testimony was present in Wester, supra, and would have been helpful here, it is not the only evidence relevant to show the testator's intent. Here, the decedent, during his brief marriage to Katina, changed beneficiaries on his retirement accounts and insurance policies. He was considering changing his will, but did not

do so. In short, he considered his old will in relation to his new marriage. He also substantially provided for Katina; Katina acknowledges that, if she received the intestate share, she would be receiving more than the decedent intended her to have.

The probate court focuses on the fact that Tiger presented no evidence of the precise dates when the decedent changed the beneficiaries of his retirement accounts and life-insurance policies. In In re Taggart's Estate, supra, the New Mexico court noted that the intent of the decedent at the time of the transfers controlled. In that case, there was an issue as to whether the transfers to the wife were to provide her with a convenient method for managing the couple's expenses or whether the transfers were for the wife's benefit. The decedent in Taggart made the transfers to his wife shortly after their marriage, and there was testimony that the decedent stated that he wanted to "protect" the wife. The court stated that it was not material that the transfers were later used by the wife for day-to-day expenses. The Taggart court went on to discuss whether the transfers were in lieu of a testamentary provision and considered the facts that the

marriage was brief, that the inter vivos transfers to the widow represented 20 percent of the decedent's total estate, that the widow was also receiving monthly retirement benefits as a result of the marriage, and that there was testimony that the decedent had wanted to provide for his former mother-in-law, who was the beneficiary under the will. The court held that the transfers were in lieu of a testamentary provision.

Although the precise timing of a transfer and the type of transfer may be relevant in some cases to show the intent of the decedent at the time a transfer is made as to whether it was a "transfer" under the omitted-spouse statute or whether it was for some other purpose, it is undisputed in the present case that the transfers were transfers outside the will under § 43-8-90. The issue in this case was whether those transfers were in lieu of a testamentary provision. Also, no one disputes that the decedent changed the beneficiaries to his retirement and insurance policies during his brief marriage to Katina.

In the present case, the amount of the transfers made during the marriage, along with the testimony that the decedent considered the terms of his will, the fact that

33

Katina was not included in the will, the fact that the decedent did not change his will, and the fact that the will ultimately benefited Dorothy's children provide reasonable proof to satisfy Tiger's burden of proving an exception to the omitted-spouse share under the facts of this case. We are cognizant of our standard of review, given that the probate court heard ore tenus evidence. However, it was the main role of the probate court in this case to apply the law to the largely undisputed material facts. We also are aware that this is the first time this Court has set out any guidelines for determining whether a transfer outside a will was in lieu of a testamentary provision, and we applaud the probate court for its well-written order.

Based on the foregoing, the judgment of the probate court is reversed, and the cause is remanded for proceedings consistent with this opinion.

REVERSED AND REMANDED.

Moore, C.J., and Murdock, Main, and Bryan, JJ., concur.