619 P.2d 562

**In the Matter of the ESTATE of James A. TAGGART, Deceased:**

**Wayne P. CUNNINGHAM, Personal Representative of the Estate of James A. Taggart, Deceased, Plaintiff–Appellee,**

v.

**Margie Ames TAGGART, Defendant–Appellant.**

**No. 4095.**

Court of Appeals of New Mexico.

Sept. 9, 1980.

Lloyd O. Bates, Jr., Las Cruces, for defendant–appellant.

James T. Martin, Jr., Las Cruces, for plaintiff–appellee.

## OPINION

ANDREWS, Judge.

Two questions are presented in this appeal from a district court probate proceeding. The first seeks a determination of the evidence required to support the jury's determination of incompetency at the time of making the power of attorney; and the second, relates to the sufficiency of the evidence to support the jury's determination that the decedent had made transfers outside of his will in lieu of providing for his surviving spouse in his will.

James A. Taggart, a widower, executed a will on March 23, 1976, which provided that his entire estate be placed in trust for the benefit of his deceased wife's mother, Margaret L. Taggart,[1] and in the event of her predeceasing the testator, the property was left in three equal parts to Barbara Shannon, Wilma P. Swingle and Wayne P. Cunningham.[2]

Subsequent to the execution of the will, Taggart married the defendant, Margie Ames Taggart (Margie). Taggart died on May 30, 1978. After the probate proceedings had been filed, Margie claimed she was an omitted spouse pursuant to § 45–2–301(A), N.M.S.A. (1978 Comp.). The personal representative (Cunningham) then filed a complaint against Margie alleging that the decedent, after having made his Last Will and Testament and after having married Margie, had provided for her by transfers outside of the will, and, in particular by designating her as a joint–tenant on a checking account,[3] designating her as a joint–tenant on a savings account,[4] and by making an election under his retirement plan from the Bureau of Reclamation to enable Margie to receive life–long retirement benefits in the amount of $410 per month. Cunningham also asserted that because Taggart was not mentally competent

prior to his death, a power of attorney he executed six days before he died was void and deeds executed by Margie under the power of attorney were also void.[5]

After trial, the jury answered interrogatories to the effect that Taggart was not mentally competent on May 24, 1978, when he signed the power of attorney; that he did not intend for the power of attorney to be used to transfer his real property into joint tenancy; and that he had provided for his spouse by transfers outside his will and intended for such transfers to be in lieu of testamentary provisions for Margie.

In her appeal, the widow asserts that there is not substantial evidence to support the jury's answer that Taggart was incompetent when he signed the power of attorney; and, there is insufficient evidence as a matter of law to support the jury's answer that Taggart had made transfers outside his will in lieu of providing for his surviving spouse in his will.

### The Power of Attorney

On May 24, 1978, Taggart, who was confined to the hospital by an illness which resulted in his death on May 30, 1978, executed a power of attorney to Margie Ames Taggart. Whether Taggart was incompetent when he signed the power of attorney is the question before us here. The jury's answer to an interrogatory has the posture, on appeal, of a finding of fact made by the trial court in a non–jury trial. The issue is whether the jury's answer is supported by evidence. Our review considers the evidence in the light most favorable to support the jury's answer; the answer is not to be set aside unless the answer is not supported by the evidence or inferences therefrom. *Lovato v. Hicks*, 74 N.M. 733, 398 P.2d 59 (1965).

---

1. A second cousin by marriage to decedent, consequently the last names are the same.

2. The three are friends or distant relatives of the deceased.

3. Account No. 05–35530–0 which had a balance of $2,889.87 at the time of decedent's death.

4. Account No. 33–000–931–6, Mutual Savings & Loan Assn. with a balance of $15,908 at the time of decedent's death.

5. Some other matters were alleged in the complaint but are not the subject of this appeal.

 Generally, a person is presumed to be competent and the initial burden of proof of incompetency is upon the party challenging competency. *McElhinney v. Kelly,* 67 N.M. 399, 356 P.2d 113 (1960); *In the Matter of the Estate of William Grady Head,* 94 N.M.App. 656, 615 P.2d 271, 1980. The question is not whether the mind of Mr. Taggart was in any way affected or impaired, but whether he, at the time of signing the power of attorney, was enjoying a lucid interval. *In the Matter of the Estate of William Grady Head, supra.*

> The action of the unimpaired faculties of the mind will supply a lucid interval. Although the mental power may be reduced below the ordinary standard, yet, if there be sufficient intelligence to understand and appreciate the act, the mental ability to execute the instrument remains and the execution thereof is valid. It is enough if the mental faculties retained sufficient strength to comprehend the act to be done. *In the Matter of William Grady Head, supra,* Vol. 19, St.B.Bull. page 764.

If a person's mind is affected or impaired, the question is whether he, at the time of execution of the instrument was enjoying a lucid interval. *In the Matter of the Estate of William Grady Head, supra.*

The evidence shows that in January, 1978, James Taggart was confined to the hospital because of pneumonia. At a later date he suffered a heart attack and was returned to the hospital by ambulance. Ted Wood, the head nurse in charge of the intensive care unit where Taggart was admitted testified that during the period in question Taggart was suffering from renal failure, cardiac failure with pulmonary edema, pleural effusion, respiratory failure with emphysema, bronchitis and asthma in addition to having diabetes mellitus and cerebral arteriosclerosis with chronic brain syndrome. In reviewing his nurse's notes, the same witness testified that Taggart was receiving Meprobamate, a sleeping medication, Keflex, an antibiotic, Lasix, a diuretic, Thorazine for agitation, Librium for sedation and Valium for agitation.

The power of attorney was executed some time during the late morning or early afternoon hours of May 24, 1978. According to Wood, that morning Taggart was referring to people in his past as if they were present and in the afternoon hours he was disoriented.

The floor nurse, Margaret Alvarez, testified that Taggart's general state was one of drifting in and out of confusion and disorientation. She testified that on the shift ending at 7:00 A.M. on May 23rd, Taggart did not know where he was; he hit his face with a water glass when attempting to drink; and that he had slept only thirty minutes before 11:30 P.M. of May 22nd, and 6:30 A.M. of May 23rd. In her opinion, since Taggart "could not stay lucid for more than an hour" it was unlikely that Taggart knew what he was doing during the shift ending at 7:00 A.M. on May 23rd.

Against this general background, Margie Ames Taggart, went to the decedent's room and procured Taggart's signature on a power of attorney. Charles Busby, Taggart's roommate, testified that Margie Ames Taggart came to the room around twelve o'clock and that Taggart refused to sign the document. Margie came back later; Taggart then signed the power of attorney. The following exchange was had between counsel and witness Busby:

BY MR. HUBERT:

Q. Did you hear Mr. Taggart say anything:

\* \* \* \* \* \*

BY MR. BUSBY:

A. I heard him say he didn't want to sign it.

Q. Did Mrs. Taggart say anything to him?

A. At that time?

Q. Yes.

A. She convinced him to sign the paper by kissing him, teasing him, that kind of thing.

Q. You had been with Mr. Taggart for approximately a day before this time?

A. Yes, sir.

Q. Could you describe to the jury what his general condition was in layman's terms?

A. I can't say what—when he was confused and when he wasn't confused because I am not aware of his normal state. I never seen him not once that I thought that he was competent. I thought he was confused the whole time. Again, I say I don't know what his normal state of mind was.

Q. Did Mrs. Taggart, during this conversation tell Mr. Taggart why she wanted the legal document executed?

A. Yes, she needed to get some money to pay some bills and living expenses.

\* \* \* \* \* \*

A. I believe he was confused the whole time, yes, sir. More at sometimes, less at sometimes, but I do not think he was normal at any time.

Cunningham also visited the hospital room that day between 4:00 P.M. and 5:30 P.M., and observed that Taggart "was not competent at all." He observed the exchange between Taggart and Margie, the substance of which was "get off my back, Margie, all you want was [sic] my blankety–blank money." Cunningham, a long time close personal friend of Taggart, testified that Taggart "didn't know who I was," that Taggart was "pantomining" like he was smoking in bed and like he was drinking with both hands, that Taggart was "talking about marching men or ships in World War II", and also talking about construction work, "to bring his gloves, to bring a wheel barrow, to keep the line taut, things of this nature." Cunningham also testified that Taggart, in his opinion, would not have understood that he was signing a power of attorney; that May 24th "wasn't any different than any other of the days that I visited with him. You know, he was—he was just kind of out of it."

However, even though Nurse Alvarez, who had no personal knowledge as to Taggart's condition on the 24th, testified that Taggart was confused on occasion, and "un-

able to stay lucid," she responded in the positive when asked if there were occasions when Taggart was "totally lucid and knew what he was doing." Wood, in testifying from the floor notes indicated "on 5–24, 7:00 to 9:00 A.M., awake, very much more alert today." Wood's testimony indicated that approximately seven hours later, the notes show that Taggart "appeared disoriented," but he never testified as to personal knowledge and observation of Taggart, and had no opinion as to Taggart's competency. Although Busby believed Mr. Taggart was confused, Margie said he was not confused at the time he executed the document even though Cunningham saw Taggart at 4:00 P.M. and thought he was confused then.

The social worker and notary public employed by the hospital who notarized the power of attorney testified as to facts that occurred at the time of the signing, including talking to Taggart, questioning him, asking him if he knew and understood what he was doing, if he was willing to sign the document, asking him if he knew what it was for and various other questions. She indicated that in her opinion he knew and understood what he was doing. However she also testified that no other patient was in the room at the time of the signing, see Busby testimony, and that Taggart was in intensive care when the power of attorney was signed. Other evidence is that Taggart had been moved out of intensive care prior to signing the power of attorney. A second hospital social worker who had seen Taggart on many occasions thought he understood what she was talking about with him.

■ In the Matter of the Estate of William Grady Head, the court dealt with general medical testimony concerning whether or not the testator could have had a lucid interval at the time he signed an amendment. Judge Sutin noted, "for Dr. Seelinger's testimony to be effective, he would have had to testify that Mr. Head could not have had a lucid interval at the time he signed the first amendment." Three things may be seen from the Head decision. The first is that the presumption is that Mr. Taggart was competent. The second is that

even a lunatic may make a will for sale of property in a lucid interval, and if a person's mind is affected or impaired, the question is whether he, at the time of the execution of the instrument, was enjoying a lucid interval. Finally, general medical testimony as to the competence or incompetence of a testator, general in time sequence that does not focus on any lucid intervals, is insufficient to show incompetence—particularly when there is conflicting testimony concerning the specific time period in which the will is signed.

However, the instant case differs from the *Matter of the Estate of William Grady Head* in that we are not confronted with an instance where the testimony in conflict is general medical testimony versus a specific statement from the time signature was made. Rather, we have two conflicting statements from the exact moment of signature. In addition, we have statements concerning the lucidity of Mr. Taggart from the immediate time surrounding the signature.

As noted above, Busby testified that Taggart at first refused to sign the paper but was convinced by Mrs. Taggart's "kissing him, teasing him, and that kind of thing." In seeming contradiction is the testimony of the social worker and notary public who testified that at the time of the signing she talked to Taggart, questioned him, and asked if he knew and understood what he was doing. It is clear that we are faced with a simple factual question which presents sufficient evidence to have allowed the jury to have decided either way. Certainly the statements of the social worker and the notary public, particularly when viewed in conjunction with Wood's testimony from the floor notes of May 24 stating that Taggart was very much more alert that day, could have allowed the jury to make a determination on the degree of impairment of Taggart's mind and the question of whether he, at the time of the execution of the instrument, was enjoying a lucid interval.

However, the evidence supports an alternative interpretation. Taggart's reluctance to sign the document, and Margie's influence upon him is testified to by Busby and is as reliable as the statements of the social worker and the notary public, having occurred at approximately the same time. In addition, there were the statements of the use of medication, the inability of Taggart to distinguish between people from the past and present, and the fact that he was disoriented that afternoon. We, therefore, are not dealing with a general statement of medical opinion as was the case *In the Matter of the Estate of William Grady Head, id.*; rather, it is conflicting testimony and the inferences therefrom which would have supported the jury's decision.

■ Therefore, since we review the evidence in the light most favorable to the jury's answer, and since the question is one for the factfinder and there was sufficient evidence for the jury to make its determination, the jury's answer of incompetency at the time of making the power of attorney is affirmed.

The second issue arises under § 45–2–301(A), N.M.S.A. (1978 Comp.), and involves the question of whether there was substantial evidence to support the jury's verdict that James A. Taggart provided for his spouse by transfers outside of his will and that he intended such transfers to be in lieu of a testamentary provision for her. Section 45–2–301(A) states:

> If a testator fails to provide by will for the surviving spouse who married the testator after the execution of the will, the omitted spouse shall receive the same share of the estate he would have received if the decedent left no will unless it appears from the will that the omission was intentional, or the testator provided for the spouse by transfer outside the will and the intent that the transfer be in lieu of the testamentary provision is shown by statements of the testator or from the amount of the transfer or other evidence.

The instant question of what constitutes substantial evidence of intent to transfer in lieu of testamentary provision appears to be an issue of first impression in New Mexico.

The Uniform Probate Code Practice Manual provides some illumination on the intended effect of this section.

Hence, the Code permits, within certain limits evidence to establish whether the testator would have wanted a share for the spouse or child. In the case of a spouse married after the execution of the will, it must appear from the will that the omission was intentional or that the testator may have provided for the spouse by transfer outside the will, such as life insurance or joint tenancy arrangements. In such cases the intent of the testator that these transfers be in lieu of a testamentary provision may be shown by evidence of the testator's statements or the amount of the transfer, or other evidence.

Uniform Probate Code Practice Manual, Vol. I, ed. Richard V. Wellman, Second Edition, 1977, p. 115.

The question is, therefore, whether such indicia as the testator's statements, the amount of transfer, and other relevant evidence were present in the instant case.

At trial, it was asserted that Mr. Taggart had made provisions for his wife sufficient to demonstrate the intent that these transfers were in lieu of any testamentary provision. Three such transfers were discussed. The first, was creation of a joint tenancy in checking account containing approximately $2,900. The second, was the creation of a joint tenancy in a savings account containing approximately $15,900. Finally, there was the assignments of benefits in a retirement plan which provides Margie Taggart with approximately $400 per month. In addition to the actual transfers, plaintiff sought to show that certain statements of the parties and the circumstances surrounding the use of the funds in these accounts demonstrated transfers intended to be in lieu of a testamentary provision.

Thus, two points must be discussed to determine whether the transfers made by James Taggart fall within the provision of § 45–2–301(A). The first point is whether the creation of the joint tenancy in the bank accounts amounts to a transfer within the meaning of the statute. The second is whether the statements of Mr. Taggart made either in contemplation of the marriage or afterward, or the amount of the transfers, provide sufficient proof of the intent of Taggart to satisfy the plaintiff's burden of proving an exception to the omitted spouse statute.

1. A transfer under § 45–2–301(A).

■■■ The statute required that, "the testator provided for the spouse by transfer outside the will." Defendant–appellant asserted that the funds from the joint account were used for paying the decedent's ex–mother–in–law's house bills and cost of living expenses for Mr. Taggart and his wife. Also, the savings account was being used to pay for the anticipated cost of a rest home. This, it is argued, undercuts the assertion that these funds had been transferred at all. Rather, defendant–appellant asserts these funds had not been truly transferred to Margie Taggart, but had merely been placed in an account convenient for the paying of general bills.

We know that generally it is held to be not sufficient to show simply the opening of a joint account in the name of one person "and" another, "or" another, without more, in order to establish a gift, or a trust. *Jones v. Fullbright, et al.*, 197 N.C. 274, 148 S.E. 229.

Also,

The testimony going to the husband's deep concern as to how easily and quickly his surviving wife could have for her use the money in the bank in case of him predeceasing her, amply supports the theory that the husband quite properly may have given consideration to the provisions of the will when he opened the joint account or, he may have forgotten or may not have been concerned about such will.

That question is not important. It is the intention of the owner of the funds at the time of making the deposit that controls.

*Menger v. Otero County State Bank*, 44 N.M. 82, 98 P.2d 834 (1940).

As in *Menger*, the question becomes simply one of whether there was evidence to support the jury's answer. If Margie was

merely given access to those funds to provide a convenient method for managing the couple's expenses, it was not a transfer to her. However, if the intention of the owner of the funds at the time of making the deposit was that those funds should become hers, for her use, it was a proper transfer.

■ In this case, the transfers were made shortly after the marriage. Also, Margie testified that "he (Mr. Taggart) just said he wanted me to be protected . . ." If such was the case, it is not material whether funds from those accounts were later used to pay day–to–day expenses. It was the intent of Mr. Taggart at the time of making the transfer which controls. *Menger, id.* The foregoing is substantial evidence that Mr. Taggart intended to provide for Mrs. Taggart, thereby permitting the jury to answer that this was a transfer.

2. Intent that the transfers be in lieu of the testamentary provision.

Notwithstanding the fact that Mr. Taggart intended to transfer the funds in the checking, savings, and retirement accounts to Margie Taggart, the plaintiffs also had the burden of demonstrating that Mr. Taggart considered the fact that she was not a beneficiary under the will and had intended the transfers to take the place of such testamentary devise. As noted above, several factors may be considered in making this determination including the period of time which the couple had been married, the amount transferred to Mrs. Taggart and the portion of the total estate to others. As to the first of these factors, the couple had been married for less than two years. This is not dispositive, but does reflect on intent. As to the portion transferred to Margie as a percentage of the entire estate, plaintiff correctly points out that the record is void of any reference to the total value of the decedent's estate. *Richardson Ford Sales v. Cummins,* 74 N.M. 271, 393 P.2d 11 (1964). However, accepting defendant's figures that the transfers represented twenty percent of the total estate, this amount when added to the $410 monthly retirement benefits would provide Margie with a not insignificant amount.

■ The trial court had before it statements from a variety of people concerning both Mr. Taggart's intent in making the original transfers and his intentions that the balance of the estate be used for other purposes. Margie herself testified that shortly after the marriage both the election of benefits and the retirement plan and other financial considerations were made to "protect" her. Also, Taggart's close friend, Wayne Cunningham testified that Taggart said "everything was settled and all taken care of and that he felt good that everything was taken care of, and he had no more worries." Finally, there were statements that the balance of the estate was to be used for, among other things, the maintenance of Margie Taggart, his former mother–in–law. Mrs. Taggart, 92 years old, testified that Taggart had paid her utility bills and had helped her financially in other ways for twenty–two years. A friend of Taggart's, Dorothy Smith, testified that Taggart had always taken care of the mother–in–law, and that Taggart had stated "that he would always see to it that Maggie was well–cared for."

The trial court stated:

The testimony is conflicting, even from the deposition and live witnesses, but the testimony that Mr. Taggart intended to take care of Mrs. Margaret L. Taggart . . . for her lifetime, and that is what the will provided may be evidenced, in addition to other testimony of witnesses, that the transfers made were intended in lieu of testamentary disposition to the wife. It is for the jury to determine. They will make that factual determination.

We believe that the trial court correctly stated the law. The jury's determination that it was the intent of Mr. Taggart to provide for Margie by transfers outside of the will was supported by substantial evidence. There was evidence which showed his intent to provide her with funds by the creation of joint accounts and a retirement plan. There was evidence to show that he had considered the terms of his will and the fact that Margie Taggart was not included

in the will. Finally, there was evidence to show that it was his intent, even after he was married, that a portion of the estate be used for other purposes.

The decision of the trial court is affirmed.

IT IS SO ORDERED.

WOOD, C. J., and LOPEZ, J., concur.