BRYAN, Justice.
Edwyna Ivey ("Edwyna") appeals from a judgment of the Monroe Circuit Court ("the trial court") denying her petition for an omitted-spouse share of the estate of her late husband, R.E. Ivey ("R.E."). For the reasons set forth herein, we reverse and remand.
Facts and Procedural History
In 1975, R.E. executed a will leaving the entirety of his estate to his first wife, Nancy S. Ivey ("Nancy"), or, in the event Nancy preceded him in death, to his and Nancy's four children-Sharyl I. Eddins ("Sharyl"), William R. Ivey ("Robbie"), Dell Moody ("Dell"), and Ty Ivey ("Ty") (hereinafter collectively referred to as "the children")-in equal shares. It is undisputed that R.E.'s 1975 will is the only will he ever executed and that he never executed a codicil to that will. Nancy died in 2001, and, in 2004, R.E. married Edwyna. R.E. died on March 26, 2014, survived by Edwyna and the children. On June 27, 2014, Sharyl, as the named executor of R.E.'s will, petitioned the Monroe Probate Court ("the probate court") to admit R.E.'s will to probate. Edwyna then petitioned the probate court for an intestate share of R.E.'s estate pursuant to § 43-8-90, Ala. Code 1975, on the basis that R.E.'s will contained no provision for her.[1] Section 43-8-90, the omitted-spouse statute, provides:
"(a) If a testator fails to provide by will for his surviving spouse who married the testator after the execution of the will, the omitted spouse shall receive the same share of the estate he would have received if the decedent left no will unless it appears from the will that the omission was intentional or the testator provided for the spouse by transfer outside the will and the intent that the transfer be in lieu of a testamentary provision be reasonably proven.
"(b) In satisfying a share provided by this section, the devises made by the will abate as provided in section 43-8-76."
The probate court admitted R.E.'s will to probate, and, upon petition from Sharyl, the trial court subsequently entered an order removing the administration of R.E.'s estate from the probate court.
In response to Edwyna's petition, Sharyl argued that Edwyna's omitted-spouse claim was due to be denied on the grounds *200 that R.E. and Edwyna had "a mutual antenuptial agreement ... wherein they each ... agreed that neither would make any affirmative claim in and to the estate of the other" and that R.E. had made "alternative provision[s]" for Edwyna in lieu of a testamentary provision. Specifically, Sharyl alleged that R.E. had provided for Edwyna by transfer outside his will in that (1) he "performed substantial renovation work in [Edwyna's] house in Andalusia, which materially increased the value of her property," and Edwyna "had no labor cost involved in the work" and (2) he and Edwyna had "established some joint bank accounts with right of survivorship" that, Sharyl contended, "substantially exceeded $100,000 in total value." On August 8, 2016, the trial court held an evidentiary hearing on Edwyna's petition, and the testimony and evidence presented at that hearing provided the following relevant facts.
Although it was undisputed that R.E. and Edwyna did not execute a written antenuptial agreement, Sharyl testified that "there was a verbal agreement made before the marriage, during the marriage, that ... [R.E.'s and Edwyna's] estates were separate." According to Sharyl, before R.E. and Edwyna married, they
"talked about the fact that they had everything planned out, that what was hers would stay hers and what was his would stay his and that that's the way they wanted it. She made the statement that she didn't need anybody's money. She had her own money and could take care of herself."
Sharyl further testified that she heard R.E. and Edwyna make similar statements "many times" throughout the course of their marriage, and multiple witnesses corroborated Sharyl's testimony. Lance Eddins ("Lance"), Sharyl's son, testified that R.E. and Edwyna's "most prevalent comment was always their affairs were always separated, meaning that her money was hers and his money was his." James Moody, Dell's husband and R.E.'s son-in-law, testified that Edwyna "had made the statement that whatever [R.E. and Nancy] ... had before they got married ... belonged to [R.E.] and [the children], and the only thing [Edwyna] felt like she ... should get ... was anything [she and R.E.] accumulated while they were married." Larry Eddins ("Larry"), Sharyl's husband, testified that "Edwyna would say things like, I'm not getting into [the children's] inheritance or that kind of thing."
Sharyl also testified to a conversation she had "many times" with R.E. regarding his will:
"I asked him [ (R.E.) ] ... [D]o you have everything in order; do you have everything like you want it? He said, I do, I do. And I said, so you're okay with everything? You've got everything like you want it? He said, yeah, you know we have told you over and over that what's [Edwyna's] is hers and what is mine is mine and that you know that I have the will ..., and it says exactly what I want it to say."
Robbie testified to a similar conversation he had had with R.E. a few months before R.E.'s death:
"Q. Did [R.E.] show [the will] to you on that occasion?
"A. Yeah, ... he said, everything is going to be divided up equally between the four kids-which I'd already known that. And he said, y'all don't need to worry about Edwyna. She's got her few hundred acres, or whatever it is, out in Conecuh County, farmland. She's got the insurance money from her son, and then she's got her retirement and other investments that are out there. She said-basically, the agreement was, you know, what's hers is hers, mine is mine, *201 and she's got plenty to take care of herself.
"Q. Specifically, did he talk about the need or the need not to make a new will?
"A. He had said-at one point they had talked about making new wills, but both of them said it was too expensive-back to they're both frugal, and he said, nothing is going to change anyway, so why change it, other than update it with new dates."
Edwyna disputed the testimony indicating that she and R.E. had agreed that "what was hers would stay hers and what was his would stay his." She testified: "Until this [litigation] c[a]me up, I never heard that statement before. You see, that's all [Sharyl's] relatives that are swearing that that's what we said." Contrary to the testimony indicating that R.E. and Edwyna had agreed that neither of them would be entitled to a share of the other's estate, Edwyna testified that R.E. intended to provide her with a share of his estate but that he had elected not to execute a new will because he believed "the state" would determine Edwyna's share of his estate. According to Edwyna, that belief was based on articles she and R.E. had read in Reader's Digest, a general-interest periodical. Regarding those articles and her and R.E.'s understanding of them, Edwyna testified:
"A. Well, we had the Reader's Digest legal guide, and in there it said that, if somebody died and left a widow-a second marriage, then the state would determine how much she would get, and it was-some states is half the estate and some is a fourth. That's what [R.E.] went by and what I went by. [R.E.] asked me, are you satisfied with that? And I said, yes. So he didn't want to go out and spend money for an attorney.
"....
"Q. You and [R.E.] both discussed this and were satisfied with whatever the state law required?
"A. That's right."[2]
Regarding the provisions R.E. allegedly made for Edwyna by transfers outside the will, it was undisputed that, when R.E. and Edwyna began dating, R.E. lived in his house in Monroeville and Edwyna lived in her house in Andalusia. After they married, R.E. retained his house in Monroeville, but he and Edwyna moved into Edwyna's house (hereinafter referred to as "the marital home") and lived there throughout their marriage. Edwyna executed a will that gave R.E. a life estate in the marital home. According to Sharyl, it "wasn't very far into the marriage" when R.E. asked her if she and Larry would help Edwyna and him remodel the kitchen in the marital home. Sharyl testified that she and Larry were happy to assist with the renovations and that, in fact, she suggested that Edwyna also make other renovations that, Sharyl said, would increase the value of the marital home. Although Edwyna initially resisted making additional renovations, Sharyl testified that "the project got bigger and bigger" until it eventually included a complete remodeling of the kitchen, two bathrooms, and a sunroom; "re-doing" floors; removing doors between the kitchen and the living room "to make it more accessible"; painting; upgrading appliances; and "doing" garage *202 doors. With the exception of the replacement of kitchen cabinets, which Edwyna paid a contractor to replace, Sharyl, Larry, and Robbie provided the labor for the renovations at no charge to Edwyna. However, Sharyl testified that Edwyna attempted to pay Larry and her for their labor but they refused any payment because "that's the way we wanted it. I would like to do that for my dad at anytime and for Edwyna."
Although Sharyl, Larry, and Robbie provided the bulk of the labor required for the renovations, R.E. and Edwyna purchased the necessary materials. However, there was no evidence of the total cost of the materials, and it was unclear how much of the materials R.E. and Edwyna each purchased separately. Sharyl testified that Edwyna "wanted it to be just her money that paid for [the renovations] because that was her house." However, she also testified that R.E. purchased "some of the things." It was undisputed that the renovations to the marital home increased its value, but there was no evidence as to the actual pre- or post-renovation value of the marital home. Rather, testimony merely indicated that, after the renovations, the marital home was "top-notch" and "pretty close" to "tip-top condition."
When asked why R.E. wanted to renovate the marital home, Sharyl testified:
"Daddy told me that he wanted [the marital home] left so that, if something happened to him, Edwyna would not be taken by somebody else, kind of like she was on her sun room. And he wanted things to be good and to be working so that she would not be taken by some other person that came along ... to fix something. He wanted it to be more modernized."
Robbie corroborated Sharyl's testimony regarding R.E.'s motivation for renovating the marital home:
"[Edwyna] had gotten ripped off when she did the screened-in porch, and I think that was kind of the running theme, if something happened to him, he didn't want Edwyna to be ripped off again, so let's get the house in order, get it more upgraded, so that she wouldn't have to worry about that in the future."
Lance and Larry similarly testified, respectively, that R.E. wanted to renovate the marital home because he wanted to ensure "that [Edwyna's] house was taken care of and leave it in a better condition if he was not able to be here" and that "he wanted things to help [Edwyna] out down the road ... to make it easier in her life."
Regarding the accounts on which R.E. and Edwyna were joint tenants, it was undisputed that, before R.E. died, he sold a trailer for approximately $60,000 and that he intended for the proceeds from that sale to be distributed equally among the children if he did not use the proceeds to purchase a new truck. Because R.E. was undecided about purchasing a truck, he deposited the proceeds into a joint account ("the trailer account") he shared with Edwyna, ownership of which succeeded to Edwyna upon R.E.'s death. Approximately two months after R.E.'s death, Edwyna sent a letter regarding the trailer account to the children. That letter stated, in pertinent part:
"Today, I elected to transfer funds out of mine and your Dad's name for the sale of the trailer ....
"The reason being: With the funds left in my name only, Winston [ (Edwyna's son] ) could have claimed a portion since my name was on the account only; therefore, I have changed the account to:
"Mrs. Edwyna L. Ivey with the beneficiaries: [Sharyl] Eddins, Ty Ivey, Dell Moody, and Robbie Ivey.
*203 "The way the account is set up: If one of you or all four of you want your fourth of the money, you can advise me and I will send you each a check. Or, you can wait until I die and receive your portion of the Money Market Account .... Each is to receive a fourth of the proceeds at the time you desire the money or at my death.
"....
"I know your Dad would want each to receive the same portion of the proceeds from the trailer. ...
"I hope this is satisfactory to each one as I did not want to involve Winston in any way. She (the lady at the bank) assured me that since it is in my name and you four children are the beneficiaries, he would not be able to get any money from this account .... I just wanted the four children to get the proceeds and I felt that is the way your Dad would want it."
In addition to the trailer account, Sharyl testified that Edwyna also succeeded to ownership of three money-market accounts on which she and R.E. were joint tenants, each of which contained approximately $15,000 at the time of R.E.'s death. Regarding those accounts, Sharyl offered into evidence a handwritten note she made during a meeting with Edwyna shortly after R.E.'s death, at which she and Edwyna discussed R.E.'s estate. That note lists, among other things, the identical balances of the three money-market accounts, with a name or names next to each balance. Written next to one of the money-market balances is Sharyl's name; written next to another are R.E.'s and Edwyna's names; and written next to another is Robbie's name. Although there was no testimony as to the significance of the names written beside the balances, Sharyl testified that her note indicates "what [Edwyna] had, where the money was, and what was to be done with that money." (Emphasis added.)
Two days after Edwyna sent the letter regarding the trailer account, she sent a letter to Sharyl regarding one of the three money-market accounts, presumably the account identified by Sharyl's name (hereinafter referred to as "the first money-market account"). That letter stated, in pertinent part:
"You will recall that your Dad had set up a $15,000 Money Market Account in your name and in his name at CCB.
"On March 10, he elected to move the account from CCB and it was $15,247.85, which was put in Southern Independent Bank, in Andalusia, Alabama, along with the check he received from the sale of the trailer, in mine and his name.
"The account was then left in my name, after the passing of your Dad, and I did not want it to look like it was part of my estate so I had it changed to my name and you as the beneficiary. The lady at the bank said I could write you a check any time you want it and I can wire transfer it or mail it to you. If I should die before you get this money, no one could receive it but you as you are the beneficiary. Let me know what you want done with this and I will abide by your wishes. I would like for it to be handled at your earliest convenience so I will know you got the amount due you.
"Hope this is all satisfactory to you ... I just wanted it so Winston would not think it was part of my estate."
Based on Edwyna's letters, Sharyl testified that the funds in the trailer account and the first money-market account "were supposed to be for us [ (the children) ]," and it was undisputed that Ty asked for and received his share of the funds in the trailer account. However, although Edwyna's letters indicated that she would distribute the funds in those accounts to the *204 children upon their requests, Sharyl testified that, "upon asking about it, we were told that her lawyer said don't release it." When asked if she intended to distribute the funds in the trailer account and the first money-market account to the children, Edwyna testified that she would "just wait and see what the judge says." However, Edwyna later testified that, "after [the children] treated me so dirty and have caused me all this stress and everything that I've been under, I wouldn't give them a dime."
As to the other two money-market accounts, Sharyl testified that one of those accounts, presumably the one identified on the note she made while meeting with Edwyna after R.E.'s death by R.E.'s and Edwyna's names, was "money that ... [R.E.] had put ... into an account for Edwyna." However, Sharyl offered no similar testimony as to the third money-market account, nor was there any other evidence as to R.E.'s intent with respect to ownership of the third money-market account, other than Sharyl's testimony that her note indicates "what was to be done with that money" and the fact that the note identifies that account as Robbie's.
Finally, Sharyl testified that Edwyna also succeeded to ownership of approximately $10,000 in a checking account on which she and R.E. were joint tenants. Edwyna testified that the joint checking account was an account she owned before she married R.E., that she added R.E.'s name to the account after they married, and that the couple used that account "to buy groceries and pay electricity bills and stuff like that." Although Edwyna conceded that R.E. deposited funds into the joint checking account throughout their marriage, there was no evidence indicating the value of the account at the time Edwyna added R.E.'s name to it or of R.E.'s contributions to the account.[3]
On August 24, 2016, the trial court entered the judgment from which Edwyna appeals, denying her petition for an omitted-spouse share of R.E.'s estate. As a threshold matter, the trial court stated that, at the parties' joint request, it would adjudicate Edwyna's request for homestead, exempt-property, and family allowances, see supra note 1, at a later date and that it was ruling on only Edwyna's omitted-spouse claim. The trial court then made detailed factual findings, set forth, in pertinent part, as follows:
"R.E. and Edwyna never executed a written antenuptial or post-nuptial agreement. Under the law of Alabama, for such an agreement to be enforceable by its terms in law it must be in writing. ( § 43-8-72, Ala. Code 1975.) However, the Court finds from the evidence that R.E. and Edwyna had a verbal agreement and mutual understanding which provided that 'what is mine will remain mine and what is his will remain his' and likewise. Various witnesses confirmed that this statement was repeated by both R.E. and Edwyna on numerous occasions throughout their marriage in the presence of family and friends. Although this verbal agreement is not enforceable as a matter of law since it is not in writing, it nonetheless sheds significant light on the intentions of the parties to the marriage with respect to the dispositions of their estates, and specifically *205 whether a spouse was unintentionally omitted in the terms of a will.
"....
"In the case at bar, the Court finds that R.E. did not unintentionally disinherit Edwyna. Instead, the Court finds that R.E. specifically re-examined his old will during his last illness, and confirmed that the terms of the old will were what he still wanted, in view of his mutual agreement and understanding with Edwyna. Therefore, the Court concludes that the underlying purpose for application of the omitted-spouse statute (i.e., to remedy the unintentional disinheritance of the surviving spouse) is not established by the facts of this case. If the underlying purpose for applying the omitted-spouse statute is not presented by the facts and the evidence, it would seem that the omitted-spouse claim could be disposed of at this juncture. However, the Court is not aware of any reported Alabama appellate decision that considers this precise issue. Therefore, the Court will continue with an analysis of the omitted-spouse statute, and the circumstances under which it is inapplicable.
"The omitted spouse statute contains two exceptions, one of which states that the statute does not apply if the spouse is specifically excluded by the terms of the will, which is obviously not presented by the facts in this case. ...
"The other exception in the omitted spouse statute is based upon a finding that the testator provided for the surviving spouse outside the will by inter vivos transfers or otherwise, in lieu of testamentary transfers. In the case at bar, the evidence is undisputed that R.E. undertook to make significant renovations, remodeling and restoration work in Edwyna's home in Andalusia. R.E. and members of his family did the bulk of this work, with no charge to Edwyna, except for materials. The entire remodeling and renovation significantly increased the value and enjoyment of Edwyna's home. The Court finds from the evidence that R.E. stated that in the event of his death he wanted to make sure that he left Edwyna with a functional house, in good repair, because she would not be able to see to the work herself. He also stated that a contractor had taken advantage of Edwyna on some work in her house on a prior occasion, and he wanted to avoid that circumstance. R.E. further stated that he intended to return to live in a small house in Monroeville if he outlived Edwyna. Considering the underlying facts of this case, the Court finds and determines that the work on Edwyna's home should be viewed as an inter vivos transfer by R.E. in lieu of a testamentary gift that satisfies the second exception under the omitted spouse statute.
"The Court further finds that approximately $100,000 in survivorship bank deposits which originated with R.E. passed to Edwyna on his death, and that such funds passing to Edwyna should be viewed as a transfer [in] lieu of a testamentary gift, also satisfying the second exception under the omitted spouse statute.
"In reaching this conclusion, the Court finds specific guidance from the case of Wester v. Baker, 675 So.2d 447 (Ala. Civ. App. 1996), which has similar facts, and the case of Ferguson v. Critopoulos, 163 So.3d 330 (Ala. 2014), which contains a detailed analysis of the omitted spouse statute, and the enumeration of several factors which a court is given discretion to consider in weighing a claim under the omitted spouse statute, including the following factors which the Court has specifically considered and afforded weight, viz: (1) inter vivos transfer *206 by R.E. consisting of the work on Edwyna's house; (2) the value of the work on Edwyna's house; (3) the value of the survivorship accounts which passed to Edwyna; (4) R.E.'s statements that he had specifically reexamined the terms of his old will, and did not elect to change the will; (5) the substantial nature of Edwyna's separate estate that she brought into the marriage; (6) the beneficiaries under R.E.'s will, who are his children, with a consideration that a significant part of his estate consisted of ancestral property which was acquired from his first wife, the mother of his children; and (7) the duration of the marriage."
Given those findings, the trial court denied Edwyna's omitted-spouse claim and certified its judgment as final pursuant to Rule 54(b), Ala. R. Civ. P. See Hellums v. Reinhardt, 567 So.2d 274 (Ala. 1990). Edwyna timely appealed.
Standard of Review
" '[W]hen a trial court hears ore tenus testimony, its findings on disputed facts are presumed correct and its judgment based on those findings will not be reversed unless the judgment is palpably erroneous or manifestly unjust.' Philpot v. State, 843 So.2d 122, 125 (Ala. 2002). 'However, where the facts before the trial court are essentially undisputed and the controversy involves questions of law for the court to consider, the court's judgment carries no presumption of correctness.' Allstate Ins. Co. v. Skelton, 675 So.2d 377, 379 (Ala. 1996). Questions of law are reviewed de novo. BT Sec. Corp. v. W.R. Huff Asset Mgmt. Co., 891 So.2d 310 (Ala. 2004)."
Alabama Republican Party v. McGinley, 893 So.2d 337, 342 (Ala. 2004).
Discussion
Section 43-8-90 provides that, if a testator's will does not provide for the testator's surviving spouse who married the testator after the execution of the will, the omitted spouse is entitled to an intestate share of the testator's estate unless one of two exceptions applies:
"(1) if it appears from the will that the omission of the surviving spouse was intentional or (2) if the testator provided for the surviving spouse with transfers outside the will with the intent that those transfers were in lieu of a provision in the will."
Ferguson v. Critopoulos, 163 So.3d 330, 343 (Ala. 2014) (emphasis added). If either of those exceptions applies, the surviving spouse is not entitled to an omitted-spouse share of the testator's estate. Id. Conversely, if neither exception applies, the surviving spouse "shall receive" an omitted-spouse share of the testator's estate. § 43-8-90 (emphasis added).
In this case, it was undisputed that there is no language in R.E.'s will indicating that the omission of a future spouse from the will was intentional. As a result, the trial court correctly determined that the first exception in the omitted-spouse statute is inapplicable. See Ferguson, 163 So.3d at 343 ("Nothing in the decedent's will indicates that the omission of Katina from the will was intentional; therefore, the first exception to the omitted-spouse share is not applicable."). Thus, unless Sharyl, as the proponent of the will, proved that R.E. provided for Edwyna by transfer outside the will and that he intended for such a transfer, if any, to be in lieu of a testamentary provision, Edwyna is entitled to an omitted-spouse share of R.E.'s estate. See Hellums, 567 So.2d at 277 (holding that "once the surviving spouse proves that he was omitted from the will, the burden of proof shifts to the *207 proponent of the will to show that the testator provided for the surviving spouse by inter vivos transfers and that those transfers were intended to be in lieu of a testamentary provision" (emphasis added)); and Becraft v. Becraft, 628 So.2d 404, 406 (Ala. 1993) (noting that, to overcome a prima facie showing of an omitted-spouse claim, the opposing party "must reasonably prove both that [the testator] provided for [the surviving spouse] by gift outside the will and that he intended this gift to be in lieu of a testamentary gift" (emphasis added)).
As noted above, the trial court determined that Edwyna received two inter vivos transfers in lieu of a testamentary provision: "the work on [the marital home]" and "approximately $100,000 in survivorship bank deposits which originated with R.E. [and] passed to Edwyna on his death." On appeal, Edwyna argues that, even if the renovations to the marital home and the funds in the joint bank accounts constitute "transfers" to her for purposes of § 43-8-90, Sharyl failed to carry her burden of proving that R.E. intended for those transfers to be in lieu of a testamentary provision. For the reasons set forth below, we agree.
I. The Renovations to the Marital Home
In reaching its conclusion that the renovations to the marital home constituted a transfer intended to be in lieu of a testamentary provision, the trial court noted that it was guided by Wester v. Baker, 675 So.2d 447 (Ala. Civ. App. 1996). In Wester, the Coosa Circuit Court denied Owen W. Wester's petition for an omitted-spouse share of the estate of his deceased wife, Virginia C. Eason. The evidence indicated that, before Wester and Eason married, Eason had lived in a house that she owned. After Wester and Eason married, they purchased three parcels of real property in joint tenancy with right of survivorship and lived in a house on that property throughout their marriage. Although Wester testified that he alone had purchased the marital property, there was conflicting testimony indicating that Eason had "helped" Wester purchase the property "so that Wester would have a house of his own and that [Eason] would not have to change her will." 675 So.2d at 448. Thus, because there was evidence from which the circuit court could have found that Eason contributed her own funds toward the purchase of the marital property and that she intended for that purchase to be in lieu of a testamentary provision for Wester, the Court of Civil Appeals affirmed the circuit court's judgment.
The circumstances in this case, however, are distinguishable from those in Wester. Unlike in Wester, where there was testimony from which the circuit court could have determined that Eason contributed her own funds toward the purchase of the house Wester received after her death, here it is undisputed that Edwyna owned the marital home before she married R.E. The trial court equated the (indeterminate) increase in the value of the marital home with Eason's purchase of marital property in Wester, but, even if we assume (which we do not) that renovating property so as to increase its value is analogous to purchasing property, R.E.'s contributions in renovating the marital home were apparently minimal. Whereas in Wester there was evidence indicating that Eason contributed funds toward the purchase of the house Wester received, the evidence in this case indicated that the only "transfer" R.E. made to Edwyna with respect to the renovation of the marital home was to purchase an unknown percentage of the necessary materials and to appeal to his family to provide free labor. However, it was also undisputed that Edwyna purchased some of the materials necessary to *208 the renovations, and, in fact, it appears that Edwyna purchased the majority of the materials because, according to Sharyl, Edwyna "wanted it to be just her money that paid for [the renovations] because that was her house." It was also undisputed that Edwyna offered to pay for the labor but that her offer was refused. Although today's opinion should not be interpreted as conclusive of the issue whether renovations to real property can ever constitute a transfer for purposes of § 43-8-90, where the evidence indicates only that the testator solicited free labor and purchased an unknown percentage of the materials necessary to renovate property the testator's surviving spouse owned before marrying the testator, those contributions from the testator, without more, do not constitute a "transfer" for purposes of § 43-8-90.
More significantly distinguishing Wester and this case is the fact that, in Wester, there was testimony indicating that Eason had expressly stated that she contributed funds toward the purchase of the house Wester received so that she would not have to change her will, i.e., that Eason intended for the purchase of the house to be in lieu of a testamentary provision for Wester. In this case, although both Sharyl and Robbie testified that R.E. had indicated to them that he did not want to change his will, they did not testify that R.E. had indicated that he wanted to renovate the marital home so that he would not have to change his will. To the contrary, Sharyl and Robbie testified, respectively, that R.E.'s motivation for renovating the marital home was specifically so that Edwyna "would not be taken by some other person that came along ... to fix something" and because he did not want her "to be ripped off again." See Ferguson, 163 So.3d at 343 (noting that one factor to consider in determining whether nontestamentary transfers were intended to be in lieu of a testamentary provision is "statements made by the testator concerning [the] transfers"). Those statements do not indicate that R.E. intended that the renovation of the marital home was to be in lieu of making a testamentary provision for Edwyna but, instead, indicate that R.E. wanted to renovate the home to protect Edwyna from opportunistic contractors.
As noted above, the fact that a testator makes a nontestamentary transfer to his or her surviving spouse is insufficient in and of itself to preclude an omitted-spouse claim. Indeed, the plain language of the second exception in § 43-8-90 requires more than mere proof that a nontestamentary transfer occurred. Rather, to show that the second exception in § 43-8-90 operates to preclude an omitted-spouse claim, the party opposing the claim must show both that the transfer occurred and that the testator intended for the transfer to be in lieu of a testamentary provision for the surviving spouse. Hellums, supra ; Becraft, supra ; and § 43-8-90. Thus, it is the testator's intent in making the nontestamentary transfer that is dispositive in determining whether the second exception in § 43-8-90 is operative in an omitted-spouse case. Here, the testimony indicated that R.E.'s intent in renovating the marital home was to protect Edwyna from being exploited by unscrupulous individuals in the event he preceded her in death; nothing in the evidence supports the conclusion that R.E. intended such protection to be in lieu of a testamentary provision for Edwyna. Accordingly, even if the renovations to the marital home had constituted a transfer to Edwyna, Sharyl failed to carry her burden of reasonably proving that R.E. intended for those renovations to be in lieu of a testamentary provision.
II. The Joint Bank Accounts
In Hellums, supra, this Court, citing *209 In re Estate of Taggart, 95 N.M. 117, 619 P.2d 562 (N.M. Ct. App. 1980), noted: "Examples of inter vivos transfers that have been held to be in lieu of testamentary provisions are the opening of joint tenancy checking and saving accounts and the assignment of retirement or insurance benefits." Hellums, 567 So.2d at 277-78. However, we reiterate that the mere fact that a testator and his or her surviving spouse are joint tenants on a bank account and that the funds in that account are thus transferred to the surviving spouse upon the testator's death is insufficient, in and of itself, to preclude the surviving spouse's omitted-spouse claim against the testator's estate. See Hellums, supra ; Becraft, supra ; and § 43-8-90 (all providing that the party opposing an omitted-spouse claim must prove the testator's intent with respect to nontestamentary transfers made to the surviving spouse). As the Court of Appeals of New Mexico stated in Taggart:
"Notwithstanding the fact that Mr. Taggart intended to transfer the funds in the checking, savings, and retirement accounts to Margie Taggart, the plaintiffs also had the burden of demonstrating that Mr. Taggart considered the fact that she was not a beneficiary under the will and had intended the transfers to take the place of such testamentary devise."
95 N.M. at 124, 619 P.2d at 569 (emphasis added).
Accordingly, if the party opposing an omitted-spouse claim shows that the claimant received the funds in a joint account shared with the testator, but fails to show that the testator intended for the receipt of those funds to be in lieu of a testamentary provision for the claimant, the claimant will be entitled to an omitted-spouse share of the testator's estate, notwithstanding the fact that the claimant received the funds in the joint account upon the testator's death. See Becraft, supra (affirming a probate court's judgment awarding the surviving spouse an omitted-spouse share of the testator's estate, even though she was the beneficiary of the testator's $25,000 life-insurance policy, because there was conflicting evidence as to whether the testator intended for the insurance proceeds to be in lieu of a testamentary provision); and Estate of Groeper v. Groeper, 665 S.W.2d 367 (Mo. Ct. App. 1984) (reversing the denial of an omitted-spouse claim despite the fact that the testator and his surviving spouse were joint tenants on multiple accounts).
In this case, it was undisputed that R.E. and Edwyna were joint tenants on the trailer account and that the account contained approximately $60,000 when R.E. died. However, it was also undisputed that R.E. intended for the children to inherit the funds in that account; that, in accord with R.E.'s wishes, Edwyna contacted the children and offered to distribute to the children, at their requests, their respective shares of the funds; and that one child, Ty, in fact requested and received his share of the funds. In addition, Sharyl, in inventorying R.E.'s estate, listed as an asset of the estate a cause of action against Edwyna for the funds in the trailer account-a tacit admission by Sharyl that R.E. never intended for those funds to belong to Edwyna. Thus, the evidence undisputedly indicated that R.E. never intended for the funds in the trailer account to belong to Edwyna, and, because he did not intend for those funds to belong to her, it naturally follows that he did not have the requisite intent that those funds would serve in lieu of a testamentary provision for her.
Likewise, although Edwyna succeeded to ownership of the first money-market account upon R.E.'s death, the evidence indicated that R.E. did not intend for the funds in that account to belong to her.
*210 Sharyl did not dispute that R.E. did not intend for the funds in the first money-market account to belong to Edwyna and, in fact, testified that those funds "were supposed to be" for her (Sharyl). In addition, Edwyna's letter to Sharyl regarding the first money-market account indicated that Edwyna offered, as she did with the funds in the trailer account, to distribute those funds to Sharyl at Sharyl's request because she wanted Sharyl to "g[e]t the amount due [her]" and that she had named Sharyl as the beneficiary on that account because she "did not want it to look like [those funds were] part of [Edwyna's] estate." Thus, as was the case with the funds in the trailer account, because the evidence indicated that R.E. did not intend for the funds in the first money-market account to belong to Edwyna, it again naturally follows that he did not have the requisite intent that those funds would serve in lieu of a testamentary provision for her.
With respect to the funds in the other two money-market accounts, the evidence undermines, rather than supports, Sharyl's argument that R.E. intended for the funds in those accounts to be in lieu of a testamentary provision for Edwyna. At the hearing, 11 witnesses, including Sharyl, testified that R.E. and Edwyna made numerous statements, both before and during their marriage, that "what was [Edwyna's] would stay hers and what was [R.E.'s] would stay his" and that "their estates were separate." Matter of Cole's Estate, 120 Mich.App. 539, 328 N.W.2d 76 (1982), involved similar testimony. In that case, Marion Cole petitioned a Michigan probate court for an omitted-spouse share of the estate of her deceased husband, Robert Cole. Although it was undisputed that, upon Robert's death, Marion received funds Robert had deposited in joint bank accounts he shared with her, the Michigan probate court awarded Marion an omitted-spouse share of Robert's estate because it found that Robert did not intend for those transfers to be in lieu of a testamentary provision for Marion. On appeal, the executor of Robert's estate argued that the remedy afforded by Michigan's omitted-spouse statute, which is practically identical to Alabama's, was unavailable to Marion because there was testimony indicating that Robert and Marion had "left their wills unchanged intentionally" and had stated "before and during the marriage that they intended to keep their property separate." 120 Mich.App. at 544, 328 N.W.2d at 78. The Court of Appeals of Michigan, however, determined that such testimony supported the Michigan probate court's finding:
"[W]e note that the executor relies largely on evidence which suggests that the testator did not intend to make any provision whatever for his wife Marion. Such evidence would not support a finding that the transfers outside the will were intended by the testator to be in lieu of a testamentary provision. If the testator intended to make no provision for Marion Cole, then he did not intend the transfers to be such a provision."
120 Mich.App. at 545, 328 N.W.2d at 79 (emphasis added).
Similarly, in this case Sharyl went to great lengths to prove that R.E. and Edwyna intended to keep their estates separate, i.e., that R.E. did not intend to provide Edwyna with anything whatsoever from his estate. However, the evidence does not support-and, in fact, directly contradicts-a conclusion that R.E. intended for the funds in the money-market accounts to be in lieu of a testamentary provision for Edwyna. That is to say, where the evidence indicates that a testator did not intend to provide his or her surviving spouse with anything whatsoever, it would be illogical to conclude that such evidence, without more, is indicative *211 of the testator's intent that the funds in the couple's joint accounts be in lieu of a testamentary provision for the surviving spouse.[4]
Regarding the $10,000 in the joint checking account, the undisputed testimony indicated only that Edwyna owned the account before she married R.E.; that she added R.E. as a joint tenant on the account after they married; that R.E. made deposits into the account throughout the marriage; and that the couple used the account to pay marital expenses. However, as we noted with respect to the money-market accounts, the evidence indicating that R.E. did not intend to provide for Edwyna at all, without more, does not support a finding that R.E. intended for the deposits he made into the joint checking account to be in lieu of a testamentary provision for Edwyna. Furthermore, the testimony that R.E. and Edwyna used the joint checking account to pay marital expenses indicates that R.E.'s intent in making deposits into that account was to contribute funds toward those expenses; nothing in the evidence supports the conclusion that R.E. intended for his contributions to the couple's marital expenses to be in lieu of a testamentary provision for Edwyna.
We reiterate once again that the mere fact that a testator and his or her surviving spouse are joint tenants on a bank account is insufficient in and of itself to avoid application of the omitted-spouse statute. Hellums, supra ; Becraft, supra ; Taggart, supra ; and Groeper, supra. In addition to showing that a testator's joint accounts were transferred to his or her surviving spouse upon the testator's death, the party opposing the surviving spouse's omitted-spouse claim has the burden of "reasonably prov[ing]" that the testator intended for the funds in those accounts to be in lieu of a testamentary provision for the surviving spouse. § 43-8-90. In this case, there was no evidence that would support the conclusion that R.E. intended for the funds in his and Edwyna's joint accounts to be in lieu of a testamentary provision for Edwyna; in fact, the evidence actually cuts against such a conclusion. Thus, Sharyl failed to carry her burden of proof regarding R.E.'s intent with respect to the funds in his and Edwyna's joint accounts, and, as a result, Edwyna's mere succession to ownership of those funds on R.E.'s death did not constitute grounds for denying her omitted-spouse claim.
We recognize that there was evidence from which the trial court could have found that R.E. intentionally disinherited Edwyna and that our reversal of the denial of Edwyna's omitted-spouse claim thus appears, at first blush, to conflict with our statement in Ferguson that "[t]he purpose of § 43-8-90 is to avoid an unintentional disinheritance of the spouse of a testator who had executed a will prior to the parties' marriage. It serves to give effect to the probable intent of the testator and protects the surviving spouse." Ferguson, 163 So.3d at 343 (emphasis added). However, as will be shown, there is no conflict between today's decision and our statement in Ferguson regarding the legislature's intent in enacting § 43-8-90.
The facts of this case present us with a question not at issue in Ferguson: In an omitted-spouse case, where there is no evidence indicating that either exception in § 43-8-90 applies, but there is nevertheless evidence indicating that the testator *212 intentionally disinherited the omitted spouse, does § 43-8-90 operate to preclude the omitted-spouse claim? The plain and unambiguous language of § 43-8-90 requires us to answer that question in the negative. See Ex parte Ankrom, 152 So.3d 397, 409-10 (Ala. 2013) (noting that " ' "[w]hen the language of a statute is plain and unambiguous, ... courts must enforce the statute as written" ' " (quoting Ex parte Pfizer, Inc., 746 So.2d 960, 964 (Ala. 1999), quoting in turn Ex parte T.B., 698 So.2d 127, 130 (Ala. 1997) )).
Section 43-8-90 plainly provides that if a testator's will does not provide for the testator's surviving spouse who married the testator after the execution of the will, the omitted spouse "shall receive the same share of the estate he would have received if the decedent left no will," i.e., an intestate share, unless the party opposing the omitted-spouse claim proves, in one of two specific ways enumerated in § 43-8-90, that the testator intentionally disinherited the omitted spouse. See Hellums, supra (regarding the burden of proof). By fashioning § 43-8-90 to provide that the party opposing an omitted-spouse claim must prove that the testator intentionally disinherited the omitted spouse and that it can do so only by proving that one of the two enumerated exceptions applies, the legislature essentially created a presumption that the testator unintentionally disinherited the omitted spouse if neither exception applies.
Had it so desired, the legislature could have drafted § 43-8-90 to provide that the party opposing an omitted-spouse claim can carry its burden of proving that the testator intentionally disinherited the omitted spouse with any evidence that tends to reflect that intent, but it did not. Rather, the legislature chose to provide two, and only two, specific types of evidence upon which the party opposing an omitted-spouse claim can rely to carry its burden. In doing so, the legislature prescribed the character of evidence sufficient to prove that the testator intentionally disinherited the omitted spouse and concomitantly rejected the reliability of other evidence the opposing party might offer to prove that the disinheritance was intentional. See Sustainable Forests, LLC v. Alabama Dep't of Revenue, 80 So.3d 270, 273 (Ala. Civ. App. 2011) ("Under the principle expressio unius est exclusio alterius, the express inclusion of one exception implies the exclusion of others."). Thus, the plain language of § 43-8-90 cannot support the conclusion that any evidence indicating that a testator intended to disinherit his or her surviving spouse is sufficient to avoid the application of § 43-8-90.
In this case, even though Sharyl offered evidence indicating that R.E. and Edwyna had agreed that "what was hers would stay hers and what was his would stay his" in an attempt to prove that R.E. intentionally omitted Edwyna from his will, she failed to offer evidence proving either that R.E.'s will indicates that Edwyna's omission was intentional or that R.E. intentionally disinherited Edwyna because he had made nontestamentary transfers to her intended to be in lieu of a testamentary provision-the only exceptions enumerated in § 43-8-90. By failing to prove that either exception in § 43-8-90 applied, Sharyl failed to prove that the omission of Edwyna from R.E.'s will was intentional, despite what other evidence might have indicated, and our reversal of the denial of Edwyna's omitted-spouse claim is therefore in accord with the legislature's intent in enacting § 43-8-90 -to avoid the unintentional disinheritance of a spouse who marries a testator after the execution of the testator's will. To hold otherwise would be to fail to give effect to § 43-8-90 as it is unambiguously written. Ankrom, supra.
*213 Conclusion
Because Sharyl failed to carry her burden of proving that either exception enumerated in § 43-8-90 applied, the trial court erred in denying Edwyna's omitted-spouse claim. Accordingly, the judgment is reversed and the case remanded for the trial court to enter a judgment awarding Edwyna an intestate share of R.E.'s estate pursuant to § 43-8-41, Ala. Code 1975. On remand, the trial court may conduct any proceedings necessary to determine Edwyna's share of R.E.'s estate.[5]
REVERSED AND REMANDED WITH INSTRUCTIONS.
Stuart, C.J., and Bolin and Main, JJ., concur.
Murdock, J., concurs in the result.

Edwyna's petition also sought homestead, exempt-property, and family allowances. See §§ 43-8-110 through -112, Ala. Code 1975.

Excerpts from the Reader's Digest were admitted into evidence. One of those excerpts states, in part: "[I]f there is no premarital agreement a spouse cannot be disinherited and can make a claim of one-third to one-half of an estate." Another states, in part: "All states ... prohibit you from disinheriting a spouse, although some may allow you to reestablish such an arrangement with a legal document such as a valid prenuptial agreement."

Sharyl also testified that Edwyna and Dell were joint tenants with R.E. on an account the parties identified as "the farm account," which contained approximately $15,000 at the time of R.E.'s death. However, it was undisputed that Dell withdrew those funds shortly after R.E.'s death and deposited them into an account to which Edwyna had no access.

Moreover, although not dispositive of this issue, it is worth noting that Sharyl's testimony indicated that, at most, R.E. intended for the funds in only one of the three money-market accounts to belong to Edwyna after his death.

Because we hold that Edwyna is entitled to an omitted-spouse share of R.E.'s estate, we pretermit discussion of the other issues she raises on appeal.