#30081-a-SRJ
**2024 S.D. 47**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

IN THE MATTER OF THE
ESTATE OF JERRY L. SIMON,
Deceased.
\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE FOURTH JUDICIAL CIRCUIT
MEADE COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE KEVIN KRULL
Judge

\* \* \* \*

ELLIOT J. BLOOM
CONOR P. CASEY of
Beardsley Jensen & Lee, Prof. LLC
Rapid City, South Dakota                    Attorneys for appellant Lynda
                                            Simon.


MICHAEL W. STRAIN of
Strain Morman Law Firm
Sturgis, South Dakota                       Attorneys for appellee Estate of
                                            Jerry L. Simon.

\* \* \* \*

ARGUED
MARCH 23, 2023
REASSIGNED
APRIL 4, 2024
OPINION FILED **08/21/24**

JENSEN, Chief Justice (on reassignment).

[¶1.]    Lynda Simon was omitted from the premarital will of her late husband, Jerry Simon.  Lynda filed a petition as an omitted spouse in the probate of Jerry's estate seeking an intestate share of his estate pursuant to SDCL 29A-2-301.  The circuit court denied Lynda's petition for an intestate share, relying upon the exception found in SDCL 29A-2-301(a)(3) to conclude that Jerry provided for her outside of the will with the intent that those transfers would be in lieu of any testamentary provision.  Lynda appeals, arguing that the circuit court erred in denying her petition for an intestate share under SDCL 29A-2-301.  We affirm.

## Factual and Procedural Background

[¶2.]    The decedent, Jerry Simon, owned a ranching operation known as Simon Ranch, Inc. (the Corporation), in Faith, South Dakota.  The primary asset of the Corporation consisted of ranchland (Simon Ranch).  The original owners of the Corporation included Jerry and his first wife Judith Simon, Jerry's parents, Dale and Jean Simon, along with Homer Ayres.  By 1982, however, Dale, Jean, Jerry, and Judith were the only remaining shareholders of the Corporation.

[¶3.]    Jerry and Judith divorced in 1987.  As part of the divorce decree, Judith retained her ownership interest in the Corporation, but the Corporation eventually bought out Judith's interest.  Jerry later married Penny L. Simon who acquired one share of the Corporation during the marriage.  Jerry and Penny divorced in July 2003 and, as part of their divorce settlement, Penny transferred her sole share of the Corporation to Jerry.  Over time, Dale and Jean sold and gifted their shares of the Corporation to Jerry, making him the sole shareholder.

[¶4.]	Shortly after Jerry's divorce from Penny was finalized, Jerry executed a new will. The will gave "all of [Jerry's] property of every kind and character and wheresoever situated," to his only child, DeLynn [Simon] Hanson. Jerry rarely discussed the contents of his will but did inform DeLynn that he intended to give her Simon Ranch after he passed away.

[¶5.]	Jerry met Lynda in 2005 while she was dealing blackjack at a gaming resort in Deadwood, South Dakota. Jerry and Lynda began dating that same year. Early in their relationship, Lynda moved three mare horses onto Simon Ranch to breed with Jerry's horses. Jerry had acquired over one hundred horses that were registered under his lifetime membership in the American Quarter Horse Association (AQHA), an association Lynda also held a lifetime membership in. Lynda began living with Jerry on the ranch in 2009. The couple married in 2011. By the time they married, all three of Lynda's mares had either been sold or died.

[¶6.]	While Jerry and Lynda were still dating, Jerry and his close friend Casey Humble discussed Jerry's decision to marry Lynda. Casey testified that during this conversation, he asked Jerry how a third marriage would impact the future of Simon Ranch. Jerry "was very direct" and reassured Casey that everything would be fine and informed him that "I have a will and [Simon Ranch] goes to DeLynn. It's intended for [DeLynn's two sons T.H. and C.H.]." Jerry also purportedly told Casey that no one else knew about the will, and no one else needed to know. Casey further testified that subsequent conversations regarding Jerry's intentions, some of which occurred after marrying Lynda, "basically all led to the same thing . . . the conversation happened numerous times about [T.H. and C.H.]

getting [Simon Ranch], or DeLynn being on the will and [T.H. and C.H.] getting [Simon Ranch]."

[¶7.] Throughout their marriage, Lynda worked on Simon Ranch. She fed livestock and aided during calving season. Lynda also financially supported the operation by personally paying for certain ranch expenses. Lynda also authorized a mortgage to be placed on a quarter section of property she independently owned, which was used as a line of credit for the Corporation.[1] This mortgage has since been satisfied by Jerry's estate.

[¶8.] In 2014 Jerry and Lynda created a joint AQHA membership. After the joint membership was created, all newborn foals from Jerry's horses and any newly acquired horses by Jerry and Lynda were registered under the joint AQHA membership. Under the design of the joint membership, Lynda would receive ownership of all the horses owned jointly if Jerry passed away before her. Jerry and Lynda considered transferring all of Jerry's previously acquired horses over to the joint membership account, however, Jerry determined that the cost to immediately transfer all of his horses over to the new account was too expensive. Lynda testified that Jerry planned instead to fully transfer the horses over to her during their marriage as new horses were born and acquired.

[¶9.] In addition to creating the joint AQHA membership, Jerry placed Lynda's name on various vehicle titles along with a Wilson flatbed and Wilson stock

---

1. The court found this property remained "in the name of Lynda Neumiller. The property was never included as an asset of Jerry's Estate. That would suggest that the parties chose to keep real estate owned by them separate from joint ownership."

trailer. Jerry added DeLynn's name to the title of several items, including a Dodge pickup and the two other Wilson trailers. Lynda testified that she and Jerry did not have any discussions about transferring any ownership interest in Simon Ranch to Lynda.

[¶10.]     Jerry passed away on September 28, 2019. Shortly after his death, Lynda, DeLynn, and DeLynn's husband drove to Spearfish to inform Jerry's mother, Jean, of his passing. After learning of her son's death, Jean inquired into Simon Ranch's future. Lynda informed Jean that Simon Ranch would stay in the family and "that ultimately [Simon Ranch] belonged to [T.H. and C.H.]"

[¶11.]     Jerry's will named his long-time friend Steve Elgen as the personal representative of his estate (the Estate). Steve had never discussed Jerry's testamentary plans, nor was he previously informed that he was designated as the Estate's personal representative. Steve filed an application for informal probate and appointment of personal representative and offered the will for probate. The will's validity was uncontested.

[¶12.]     The estimated value of the Estate was $1,331,105.63, most of which was comprised of the Corporation's ownership of Simon Ranch, which has not been appraised. As a part of the administration of the Estate, the horses Jerry owned individually were sold for a total of $109,250.00. The value of horses that were owned jointly, and either sold or retained for Lynda's benefit were valued at approximately $68,026.88. In addition to the sale of horses, Lynda also received proceeds from the sale of various personal property and other jointly owned assets

she received at the time of Jerry's death. Lynda acknowledges that the total value she received from the jointly owned assets was $106,301.[2]

[¶13.]     Lynda initially filed a petition for a surviving spouse elective share in the probate proceedings under SDCL 29A-2-202. Lynda later filed this petition claiming to be an omitted spouse under the will pursuant to SDCL 29A-2-301 for an intestate share of the Estate. Following a two-day evidentiary hearing, the circuit court entered findings of fact and conclusions of law denying Lynda's application for an intestate share of the Estate. In doing so, the court concluded that granting Lynda's petition would go "directly against the wishes of [Jerry,]" because "[t]he other evidence in this case clearly shows that [Jerry] intended [Simon Ranch] to stay in the family[.]" Additionally, the court found that "[t]he evidence presented show[ed] that [Jerry] provided for [Lynda] outside of the [w]ill by his statements, transfers made, the amount of the transfers, and the other evidence presented." After denying Lynda's petition under SDCL 29A-2-301, the court granted Lynda's petition for an elective share of the Estate, providing her with 21% of Jerry's augmented estate in accordance with SDCL 29A-2-202.

---

2.     Lynda has not formally challenged the Estate's valuation of the jointly owned assets she received. However, at the hearing, some discrepancies were pointed out that may reduce the actual value of the jointly held assets Lynda received. Despite the discrepancies, the exact value of the jointly owned assets that Lynda received is not determinative of our resolution of this case under SDCL 29A-2-301 because Lynda does not dispute Jerry provided for her during his lifetime by converting assets he owned into jointly owned assets that she received upon his death.

[¶14.]     Lynda appeals the circuit court's decision and argues that the court erred when it denied her petition for an intestate share of the Estate as an omitted spouse under SDCL 29A-2-301.

## Standard of Review

[¶15.]     Lynda and the Estate disagree on the appropriate standard of review for this Court to apply on appeal. Lynda asserts that this Court should review the circuit court's determination de novo. She argues that the determination of whether Jerry intended to provide for Lynda outside of his will requires this Court "to consider legal concepts in the mix of fact and law and to exercise judgment about the values that animate legal principles." *Huether v. Mihm Transp. Co.*, 2014 S.D. 93, ¶ 14, 857 N.W.2d 854, 860 (citation omitted).

[¶16.]     The Estate, however, argues that the proper standard is to review the circuit court's decision for clear error. This is because, according to the Estate, the issue raised by Lynda relates to the circuit court's factual findings, particularly whether the non-testamentary transfers Jerry made to Lynda were intended to be in lieu of any testamentary provision.

[¶17.]     Lynda's appeal raises a mixed question of law and fact. However, the determination of Jerry's testamentary intent under SDCL 29A-2-301 was primarily a factual inquiry for the circuit court. When deciding cases involving a mixed question of law and fact, the proper standard of review is dependent upon the nature of the inquiry:

> If application of the rule of law to the facts requires an inquiry that is "essentially factual"— one that is founded "on the application of the fact-finding tribunal's experience with the mainsprings of human conduct"—the concerns of judicial

> administration will favor the [trial] court, and the [trial] court's determination should be classified as one of fact reviewable under the clearly erroneous standard. If, on the other hand, the question requires us to consider legal concepts in the mix of fact and law and to exercise judgment about the values that animate legal principles, then the concerns of judicial administration will favor the appellate court, and the question should be classified as one of law and reviewed de novo.

*Stockwell v. Stockwell*, 2010 S.D. 79, ¶ 16, 790 N.W.2d 52, 59 (quoting *Darling v. West River Masonry, Inc.*, 2010 S.D. 4, ¶ 10, 777 N.W.2d 363, 366) (alterations in original). Ultimately, the applicable standard of review should reflect which "judicial actor is better positioned" to make the decision. *Miller v. Fenton*, 474 U.S. 104, 114, 106 S. Ct. 445, 451, 88 L. Ed. 2d 405 (1985). Thus, when the issue is "essentially factual" the circuit court's determination is "subject to the clearly-erroneous rule." *Pullman-Standard v. Swint*, 456 U.S. 273, 288, 102 S. Ct. 1781, 1790, 72 L. Ed. 2d 66 (1982).

[¶18.] The determinative issue in this case required the circuit court to decide whether Jerry provided for Lynda outside of his will with "the intent that the transfer be in lieu of a testamentary provision[.]" SDCL 29A-2-301(a)(3). This inquiry required the court to state the legal standard and perform "the fact-intensive job of exploring" Jerry's testamentary intent based upon his statements, conduct, and other evidence. *U.S. Bank Nat. Ass'n ex rel. CWCap. Asset Mgmt. LLC v. Vill. at Lakeridge, LLC*, 583 U.S. 387, 398, 138 S. Ct. 960, 968, 200 L. Ed. 2d 218 (2018) (citation omitted). Issues of this kind are "about as factual sounding as any mixed question gets." *Id.* at 397, 138 S. Ct. at 968; *see also Pullman-Standard*, 456 U.S. at 288, 102 S. Ct. at 1790 ("Treating issues of intent as factual matters for the trier of fact is commonplace.").

[¶19.]    Other state courts have also treated issues of testamentary intent as a question of fact, subject to clear error review. *See Matter of Conservatorship of H.D.K.*, 497 P.3d 1171, 1178 (Mont. 2021) ("Testamentary intent is a question of fact."); *Matter of Webber's Estate*, 551 P.2d 1339, 1341 (Idaho 1976) ("The question of testamentary intent is a question of fact for the trier of fact to be determined according to the particular facts of the case."); *In re Estate of Hoigaard*, 360 N.W.2d 360, 362 (Minn. Ct. App. 1984) ("The issue of intentional omission is a question of fact for the trier of fact to determine."). We likewise conclude the factual nature of determining Jerry's testamentary intent under SDCL 29A-2-301 is appropriately reviewed for clear error.

[¶20.]    Under a clearly erroneous review of the circuit court's decision,

> The question is not whether this Court would have made the same findings that the trial court did, but whether on the entire evidence we are left with a definite and firm conviction that a mistake has been committed. This Court is not free to disturb the lower court's findings unless it is satisfied that they are contrary to a clear preponderance of the evidence. Doubts about whether the evidence supports the court's findings of fact are to be resolved in favor of the successful party's version of the evidence and of all inferences fairly deducible therefrom which are favorable to the court's action.

*In re Estate of Olson*, 2008 S.D. 97, ¶ 9, 757 N.W.2d 219, 222 (internal quotations omitted) (quoting *Osman v. Karlen and Associates*, 2008 S.D. 16, ¶ 15, 746 N.W.2d 437, 442–43).

## Analysis and Decision

[¶21.]    Lynda argues that the circuit court erred when it found that the "evidence presented shows that [Jerry] provided for [Lynda] outside of the Will by his statements, transfers made, the amount of transfers, and other evidence

presented[.]" She maintains that "[t]here is no evidence showing Jerry ever [directly] stated the transfers Lynda received were in lieu of a testamentary provision." She further argues that the circuit court could not reasonably infer from the amount of transfers Lynda received that Jerry intended to provide for Lynda outside of the will. According to Lynda, the $106,301.88 she received is "a de minimis amount . . . in comparison to the value of Jerry's entire estate" as it amounts to less than 10% of the total value of the Estate. Lastly, Lynda alleges that Jerry's conversations with Casey regarding his desire to leave Simon Ranch to DeLynn is "immaterial and irrelevant" because it was made prior to being married to Lynda and because they were made in relation to divorce, not death.

[¶22.] The Estate responds that the evidence reasonably led the court to conclude that Jerry provided for Lynda outside of his will with the intent that these transfers were in lieu of a testamentary transfer. It highlights that Lynda received over $100,000 from the sale of horses and other assets Jerry transferred to her during his lifetime. The Estate also contends that the court appropriately relied on Jerry's statements to DeLynn and Casey to infer what Jerry's intentions were. The Estate further argues that the fact that Jerry and Lynda owned real property under their individual names, along with the duration and timing of their marriage, allowed the court to infer that the couple intended to keep their real property as separate property. According to the Estate, this supports the court's finding that Jerry did not intend to provide any testamentary gift to Lynda.

[¶23.] SDCL 29A-2-301(a)(3) provides:

> A testator's surviving spouse who married the testator after the execution of the testator's will is entitled to receive, as an

intestate share, no less than the value of the share of the estate the surviving spouse would have received if the testator had died intestate, unless . . . [t]he testator provided for the spouse by transfer outside the will and the intent that the transfer be in lieu of a testamentary provision is shown by the testator's statements or is reasonably inferred from the amount of the transfer or other evidence.

[¶24.]     This Court has not yet reviewed and applied SDCL 29A-2-301(a)(3). The design of this statute is to "protect the testator's surviving spouse against unintentional disinheritance resulting from a premarital will."  Restatement (Third) of Property § 9.5 (2003).  "Because the protection afforded by [SDCL 29A-2-301] only relates to unintentional disinheritance, the statute[] does not apply . . ." when the testator intentionally omits their spouse.  *Id.* cmt. d.  Thus, while the statute is designed to protect an unintentionally omitted spouse, the exception is designed to preserve a testator's testamentary intent when there is evidence demonstrating a decedent's intent to omit their spouse from their will.

[¶25.]     Pursuant to SDCL 29A-2-301, the omitted spouse must initially make a prima facie showing that they are a surviving omitted spouse.  Neither party disputes that Jerry executed his will nearly eight years before marrying Lynda and that Jerry's will does not reference Lynda in any capacity.  Furthermore, at the time of Jerry's passing, he and Lynda remained lawfully married.

[¶26.]     Once the initial burden is satisfied, the omitted spouse is entitled to receive a statutory intestate share, unless the testator's estate shows that the testator (1) provided for the spouse outside the will, and (2) had the intent that the transfer was in lieu of a testamentary gift as shown by the testator's statements or reasonably inferred by the amount of the transfer or other evidence.  SDCL 29A-2-

301(a)(3). The circuit court determined that Jerry provided for Lynda by creating a joint tenancy ownership interest in "all newly purchased horses and [] foals that were born of [Jerry's] existing horse herd . . ." which qualifies "as transfers outside of the [w]ill and [provided] compensation to [Lynda]." This finding has not been challenged by Lynda on appeal. Thus, the dispositive issue is whether Jerry intended these transfers to be in lieu of any testamentary gift.

[¶27.]	In considering Jerry's intent, the circuit court determined that granting Lynda an intestate share under SDCL 29A-2-301 would go "directly against the wishes of [Jerry]". The court found that "the transfers of the new foals produced by [Jerry's] mares, and future acquisitions to joint-tenancy ownership . . . show that [Jerry] intended to provide for [Lynda] outside of the [w]ill, and the plan, had [Jerry] not expired, would have allowed the eventual total ownership of the horses to [Lynda]." The court based this determination on the statements made by Jerry to Casey, as well as upon "other evidence in this case clearly [showing] that [Jerry] intended [Simon Ranch] to stay in the family, and [Lynda] acknowledged that fact." The court specifically found that Jerry's "intent was that [Simon Ranch] was to stay in the family and eventually go to [DeLynn] and then to the grandchildren."

[¶28.]	We cannot say the circuit court clearly erred in its findings concerning Jerry's intent. Aside from Simon Ranch, the primary assets Jerry owned were his horses. While he was still alive, Jerry began the process of transferring his horses to Lynda by placing all the new foals born, or horses purchased into joint ownership. Jerry also transferred other personal property he owned into joint ownership.

While the value of these assets is not proportional to the value of Simon Ranch, a will substitute, under SDCL 29A-2-301, need not be equal to the value the spouse would have received through intestacy. *See Ferguson v. Critopoulos*, 163 So. 3d 330, 342 (Ala. 2014) ("[T]here is no requirement that an inter vivos or extra-estate gift be equal to or approximately the same as an intestate share to qualify as a transfer in lieu of a testamentary provision.").

[¶29.]    In addition to the lifetime transfers made by Jerry, the record shows that before marrying Lynda, Jerry clearly expressed to Casey that he intended for DeLynn to receive Simon Ranch after he died.  Casey also testified to several other similar conversations he had with Jerry after he married Lynda.  In all of these conversations, Jerry expressed an intention that he wanted Simon Ranch to go to DeLynn and eventually to the grandchildren.  Casey testified that the conversations after the marriage "all led to the same thing.  I mean, the conversation happened numerous times about [the grandchildren] getting [Simon Ranch], or DeLynn being on the will and [the grandchildren] getting [Simon Ranch]."

[¶30.]    Jerry's initial statement to Casey that Simon Ranch would stay in the family and that he had a will giving everything to DeLynn, occurred before the marriage but after Jerry had decided to marry Lynda.  However, Jerry's statements both before and during the marriage show that Jerry was resolute in his intention to leave Simon Ranch to DeLynn and omit Lynda from his will.  *See* SDCL 29A-2-301 (identifying that one of the methods for discerning a testator's intent is by analyzing their statements).

[¶31.]    Furthermore, Lynda's own acknowledgement shortly after Jerry's death that Simon Ranch was "going to stay with the family[,]" reflects her understanding of Jerry's intent to provide for her through other means.  The circuit court's inference that these statements indicate that Lynda knew and understood Jerry's intent to provide for her through means other than a will was not clearly erroneous on this record.

[¶32.]    Other evidence also supports the circuit court's determination of Jerry's testamentary intent.  The primary asset Jerry owned was Simon Ranch, through his ownership of the Corporation, which had been in his family for more than one hundred years.  Jerry had given shares of stock in the Corporation to his two prior spouses, which were eventually transferred back to Jerry during divorce proceedings.  However, Jerry never gave Lynda any interest in Simon Ranch or the Corporation during their marriage.  Additionally, Jerry's intent to keep Simon Ranch separate from Lynda is further supported by the fact that after their marriage, the parties began to co-title certain assets such as vehicles, horses, and trailers but always maintained separate ownership of real property.

[¶33.]    Ultimately, the court was permitted to "consider all [of the] relevant evidence" available to it and was not required to consider each piece of evidence in isolation.  Restatement (Third) of Property § 9.5 cmt. d. (2003).  In doing so, and consistent with the language of SDCL 29A-2-301(a)(3), the court properly considered the amount of non-testamentary transfers Jerry made to Lynda, his statements to DeLynn and Casey, along with the "other evidence" available to infer that Jerry intended to exclude Lynda from his will.  The circuit court was in the

best position to make findings and draw inferences from all the evidence presented to determine that Jerry intended to provide for Lynda, during this lifetime, outside of his will. We are not left with "a definite and firm conviction that a mistake has been made" by the circuit court in determining Jerry's intent under SDCL 29A-2-301(a)(3). *Estate of Olson*, 2008 S.D. 97, ¶ 9, 757 N.W.2d at 222.

[¶34.] We affirm the circuit court's decision to deny Lynda's petition for an intestate share under SDCL 29A-2-301, and grant Lynda an elective share equal to 21% of Jerry's augmented estate under SDCL 29A-2-202.

[¶35.] SALTER and DEVANEY, Justices, concur.

[¶36.] KERN and MYREN, Justices, dissent.

KERN, Justice (dissenting).

[¶37.] I respectfully dissent from the majority's conclusion that the transfers to Lynda outside the will were done with the intent that they serve in lieu of a testamentary provision, as required under SDCL 29A-2-301(a)(3). Because of the decided lack of proof to that effect, Lynda was entitled to an intestate share of the estate.

[¶38.] The parties disagree regarding the correct standard of review to apply in this case, with Lynda urging this Court to apply de novo review and the Estate arguing for clear error review. I agree with the majority that this appeal is characterized as one that "involves a mixed question of law and fact." *In re Dorsey & Whitney Tr. Co. LLC*, 2001 S.D. 35, ¶ 6, 623 N.W.2d 468, 471. With a mixed question of fact and law, the standard of review to be applied depends on the nature of the inquiry needed to answer the question on appeal. *See Rios v. S.D. Dep't of*

*Soc. Servs.*, 420 N.W.2d 757, 759 (S.D. 1988). "If application of the rule of law to the facts requires an inquiry that is 'essentially factual,' . . . the concerns of judicial administration will favor the [circuit] court, and the [circuit] court's determination" will be reviewed for clear error. *Permann v. South Dakota Dep't of Labor*, 411 N.W.2d 113, 118 (S.D. 1987) (citation omitted). If, however, the inquiry involves determining whether the facts satisfy the legal standard as required under SDCL 29A-2-301(a)(3), the question should be reviewed de novo. *See U.S. Bank Nat. Ass'n ex rel. CWCap. Asset Mgmt. LLC v. Vill. at Lakeridge, LLC*, 583 U.S. 387, 395–96, 138 S. Ct. 960, 966–67, 200 L. Ed. 2d 218 (2018); *see also Stockwell v. Stockwell*, 2010 S.D. 79, ¶ 16, 790 N.W.2d 52, 59; *Erdahl v. Groff*, 1998 S.D. 28, ¶ 30, 576 N.W.2d 15, 21.

[¶39.]     With these principles in mind, we must determine the nature of the inquiry at issue. While the majority concludes that the question of Jerry's testamentary intent is a question of fact reviewed for clear error, in my view, whether the facts as found by the circuit court meet the standard set forth in SDCL 29A-2-301(a)(3) is a question of law. Therefore, the appropriate standard of review in this case is de novo.

[¶40.]     South Dakota has long ensured that surviving spouses are not left destitute after being omitted from their deceased husband's or wife's premarital will. *See, e.g., In re Larsen's Estate*, 18 S.D. 335, 100 N.W. 738, 739 (1904). Before the Legislature's decision in 1995 to enact laws modeled after the Uniform Probate Code (UPC), a person's premarital will was revoked in its entirety if their spouse survived them and the deceased did not provide for their surviving spouse through

a provision in the will or by a marriage contract, or if the will mentioned the spouse and intended to make no provision. S.D. Rev. Civ. Code § 1023, Subd. 2 (1904); S.D. Rev. Civ. Code § 629, Subd. 2 (1919); SDCL 29-3-7 (1984).[3]

[¶41.]     In adopting portions of the UPC in 1995, the Legislature enacted SDCL 29A-2-301, which protects a surviving spouse from unintentional disinheritance resulting from a premarital will, while simultaneously preserving the decedent's known testamentary wishes as expressed in that premarital will.[4]

---

3.     "If after having made a will, the testator marries, and the wife survives the testator, the will is revoked, unless provision has been made for her by marriage contract, or unless she is provided for in the will, or in such way mentioned therein as to show an intention not to make such provision; and no other evidence to rebut the presumption of revocation can be received." SDCL 29-3-7 (1984).

4.     South Dakota's premarital will statute is modeled after the 1990 Revision of the Uniform Probate Code (UPC). In 1993, UPC § 2-301 was amended to account for circumstances involving multiple marriages, as in the present case. Currently, UPC § 2-301(a) states:

> If a testator's surviving spouse married the testator after the testator executed the testator's will, the surviving spouse is entitled to receive, as an intestate share, no less than the value of the share of the estate the spouse would have received if the testator had died intestate as to that portion of the testator's estate, if any, *that neither is devised to a child of the testator who was born before the testator married the surviving spouse and who is not a child of the surviving spouse* nor is devised to a descendant of such a child or passes under Sections 2-603 or 2-604 to such a child or to a descendant of such a child, unless . . .

(Emphasis added.) Under the UPC, a surviving spouse is not entitled to an intestate share if the decedent devises everything to his or her child. The editorial comments after the revision explain that the change was intended to reflect "the view that the intestate share of the spouse in that portion of the testator's estate not devised" to the testator's children "is what the testator would want the spouse to have if he or she had thought about the relationship of his or her old will to the new situation." However, because

(continued . . .)

#30081

As reflected by the preservation rather than presumptive revocation of the decedent's premarital will, the code is meant to be "intent-effecting," *see* Lawrence W. Waggoner, *Spousal Rights in Our Multiple-Marriage Society: The Revised Uniform Probate Code*, 26 Real Prop. Prob. & Tr. J. 683, 749 (1992), *cited with approval in* UPC § 2-301, 8 U.L.A. 94, 96 (2023), meaning the code entitles the surviving spouse to a share of the testator's estate more closely aligned with what the testator would have wanted had he or she reviewed the will after marriage. *See* UPC § 2-301, 8 U.L.A. at 94.

[¶42.]     Yet, this also means that the statute must yield to the decedent's intent when evidence shows that it contradicts the statute's objective, such as in cases where the disinheritance was intentional or the decedent had provided for the spouse by means outside the will. *See* Waggoner, 26 Real Prop. Prob. & Tr. J. at 749, *noted with approval in* Entitlement of Spouse; Premarital Will., UPC § 2-301. And therein lies the narrow and dispositive issue in this case–whether Jerry's transfers outside of his will were intended to be in lieu of a provision in his will. In making this determination, we are required to consider whether granting Lynda entitlement to Jerry's estate pursuant to SDCL 29A-2-301 would be contrary to his testamentary intent.

[¶43.]     To determine Jerry's intent, the Court must consider the testator's statements or reasonable inferences from the amount of the transfer or other

---

(. . . continued)
    South Dakota did not enact this portion of the 1993 amendment to UPC § 2-301(a), the language concerning devises to a child of the testator does not apply to this case.

evidence. SDCL 29A-2-301(a)(3). In determining that Jerry intended for the transfers to be in lieu of a testamentary provision in his will, the majority relies on the following evidence: (1) Jerry's transfer of horses to Lynda during his lifetime; (2) Jerry's statements to Casey Humble that he wanted the ranch to go to DeLynn and eventually to his grandchildren; (3) Lynda's acknowledgement that the ranch was "going to stay with the family;" (4) Jerry's failure to give Lynda any interest in the ranch, although he gave his prior two wives such an interest; and (5) the parties' titling of certain assets jointly, but maintaining separate ownership of their real property.

[¶44.] In my view, none of this evidence supports an inference that Jerry intended that the transfers to Lynda outside his will *were in lieu of a testamentary gift*. First, with regard to the value of the horses that Jerry transferred to Lynda during his lifetime, the majority—relying upon *Ferguson v. Critopoulos*, 163 So. 3d 330, 344 (Ala. 2014)—points out that while the value of those assets is not proportional to the value of the ranch, a will substitute need not be equal to what Lynda would have received through intestacy. While SDCL 29A-2-301 unambiguously authorizes courts to consider the amount of the transfer(s) as evidence of the testator's intent, *see also Becraft v. Becraft*, 628 So. 2d 404, 407 (Ala. 1993); *Matter of Knudsen's Estate*, 322 N.W.2d 454, 460 (N.D. 1982) (Vande Walle, C.J., concurring), such comparison must be accurate and reasonable.

[¶45.] Here, the circuit court incorrectly drew a relationship between the value (represented as a percentage) of the horses that were jointly titled (41.35%) and the share of the estate Lynda would receive as an elective share (21%). After

comparing these two percentages, the court determined that the amount of the transfers was evidence that Jerry "intended to provide for [Lynda] outside of the will." This comparison, however, was conceptually flawed from the outset and has little probative value. The elective share is a percentage of the total augmented estate, which cannot be meaningfully compared to the ratio of jointly versus individually owned horses.[5]

[¶46.]     Also, the circuit court's comparison to the elective share has no relevance in illuminating the testator's intent to provide for a surviving spouse outside the will. The elective share is a statutory entitlement granted to surviving spouses to protect against disinheritance and enforce the decedent's duty to provide for the surviving spouse. *See In re Estate of Shipman*, 2013 S.D. 42, ¶¶ 15, 19, 832 N.W.2d 335, 340–42 ("After the death of one spouse, the duty of support 'continues in favor of the survivor in the form of a claim on the decedent's estate.'"). However, the share granted is determined by a statutorily prescribed formula, not by the testator. *See id.* ¶ 15, 832 N.W.2d at 340.

---

5.     The computation of an augmented estate is explained in SDCL 29A-2-203, which provides:

> Subject to § 29A-2-208, the value of the augmented estate, to the extent provided in §§ 29A-2-204, 29A-2-205, 29A-2-206, and 29A-2-207, consists of the sum of the values of all property, whether real or personal, movable or immovable, tangible or intangible, wherever situated, that constitute the decedent's net probate estate, the decedent's nonprobate transfers to others, the decedent's nonprobate transfers to the surviving spouse, and the surviving spouse's property and nonprobate transfers to others.

[¶47.] The circuit court erred, under either standard of review, by not performing the correct comparison, which is between the total property value transferred to Lynda as compared to the estate's total value. By doing so, it is apparent that the value transferred was so minimal relative to the estate's value that it would be unreasonable to infer that Jerry intended for those transfers to provide for Lynda in lieu of a provision in the will. Lynda acquired $77,026.88 through the value of horses held in the joint AQHA account. The horses owned by Jerry's estate were sold for $109,250.00. Thus, Lynda's joint ownership of the horses amounted to 41.35% of the total value of the horses. Still, this was a small portion of the entire estate. Combined with the change in title of the vehicles and trailers, Lynda's ownership of horses and other items totaled $106,301.88—only 7.99% of the $1,331,105.63 estate.

[¶48.] Courts in other jurisdictions, when considering whether a transfer is in lieu of a testamentary provision, have looked to the amount of the transfer(s) as a convincing indication of the testator's intent. *See, e.g.*, *In re Estate of King*, 444 P.3d 863, 867–68 (Colo. App. 2019). When the value transferred is substantial, either in isolation or when compared to the estate's total value, courts have concluded that they can reasonably infer that the testator intended to provide for their surviving spouse through extra-testamentary transfers. That said, courts are unwilling to infer intent when the amount transferred appears to be de minimis when compared to the estate's total value. *See Becraft*, 628 So. 2d at 406, 407 (affirming lower court's determination that a $25,000 life insurance policy was not sufficient to conclude that the testator intended for it to be in lieu of a testamentary provision).

[¶49.] In *In re Timmerman*, the South Carolina Court of Appeals concluded that transfers totaling $1,191,000.00 evinced intent that they were in lieu of a testamentary provision. 502 S.E.2d 920, 922 (S.C. Ct. App. 1998). The court reasoned that "the sheer magnitude of the transfers . . . is enough to support the probate court's finding that [the decedent] did not intend for [his spouse] to receive any benefits under the omitted spouse statute." *Id.* In *Ferguson*, the Supreme Court of Alabama held that the decedent's extra-testamentary transfers to the surviving spouse amounting to $548,000 and a $900 monthly stipend from pension benefits, payable for the remainder of the surviving spouse's life, was evidence that the transfers were in lieu of a provision in the decedent's will. 163 So. 3d at 344.

[¶50.] Similarly, in *Estate of King*, the Colorado Court of Appeals considered whether a surviving spouse omitted from the decedent's premarital will was precluded from claiming an intestate share of the decedent's estate even though he left her a $4,000,000 life insurance policy, $52,000 contained in joint bank accounts, and $410,806 from decedent's retirement plans. 444 P.3d at 864–65. The court held that the amount transferred relative to the couple's ten-month marriage "supports the permissible inference that [the] decedent intended the transfer to provide for [the] surviving spouse in lieu of a testamentary disposition." *Id.* at 868.

[¶51.] In *Matter of Estate of Bartell*, the decedent transferred $230,000 to the surviving spouse in the years preceding his death. 776 P.2d 885 (Utah 1989). Though this transfer is considerably less than the examples above, the court found that the amount reflected the intent that the transfer was in lieu of a testamentary

provision because it represented approximately 70% of the augmented estate, leaving only $100,000 within the estate. *Id.* at 885–86.

[¶52.]    Here, neither the dollar amount ($106,301.88) nor the proportional amount (7.99%) supports the majority's premise that Jerry intended the transfers to be in lieu of a testamentary provision. Though the transfers Jerry made are not *de minimis*, given their size relative to the total estate, they alone are not substantial enough for the circuit court to have inferred Jerry's intent under SDCL 29A-2-301(a)(3).

[¶53.]    Second, although the majority does not specifically address whether Jerry's statements to Humble qualify as a statement under SDCL 29A-2-301(a)(3), it relies upon the evidentiary value of the statement as a statement of testamentary intent. However, not only did the conversation take place before Jerry and Lynda married, but Humble acknowledged that the conversation occurred in the context of a future divorce, not with reference to the disposition of Jerry's property after death.

[¶54.]    Furthermore, Jerry and Humble's conversation, which occurred somewhere between 2009–2011, was not in close temporal proximity to any of the transfers. Jerry and Lynda married in 2011. Lynda's lifetime AQHA account was not converted to a joint account until 2014. Therefore, the conversation occurred at least three years before any horses were registered in the joint-tenancy AQHA account. Moreover, during this conversation, Jerry gave no indication of his intent to make provisions for Lynda outside of his will. Although the discussion with Humble may reveal Jerry's general testamentary intent *before* marriage, it fails to show that Jerry, after seven years of successful marriage, during which Lynda

assisted and supported the activities of the ranch, thought about his old will in relation to his new situation.[6] *See* UPC § 2-301, 8 U.L.A. 94, 95 (2023). The conversation with Humble does not, therefore, constitute a statement evidencing Jerry's intent to provide for Lynda through extra-testamentary transfers.

[¶55.] Third, in relying on Lynda's statements to Jerry's mother about what would happen to the ranch, the circuit court failed to consider the attendant circumstances. According to DeLynn's testimony, Lynda accompanied her and DeLynn's husband to Spearfish to inform Jerry's mother about his passing. During the conversation, Jerry's mother "was devastated to say the least," and became very concerned about the future of Simon Ranch. Jerry's mother was starting to get dementia, which affected her short-term memory. She "asked numerous times" during their conversation "[w]ell, what's going to happen with the ranch?" Lynda answered her questions by stating that "it would stay with DeLynn and the family." These conversations also occurred within a day or two of Lynda learning about Jerry's will for the first time and before she had the opportunity to consult an attorney about her rights as a surviving spouse.

[¶56.] Simply put, Lynda's statements to Jerry's aged and grieving mother at the time of the death announcement are not proof that Jerry intended for the transfers to be in lieu of a testamentary provision. They reflect, at most, Lynda's feelings in the moment that the ranch should eventually belong to the

---

6. The record also reflects that Jerry knew how to update his will if he wished to do so after a change in his marital status. According to DeLynn, Jerry laughed when he told her that he updated his will in 2003 following his second divorce to exclude his second wife because he realized he "hadn't had it done since [he] divorced [her] mom."

grandchildren.[7]  Even so, and importantly, her beliefs concerning the ranch are *not indicative of Jerry's intent* regarding the testamentary nature of the joint property transfers.  *See Matter of Beaman's Estate*, 583 P.2d 270, 274–75 (Ariz. 1978) (holding statements by the surviving spouse—including, "[t]his belongs to you, kids" and "everything that was here this was the children's property"—did not constitute evidence of the decedent's intent).

[¶57.]         Fourth, the fact that Jerry gave shares of the ranch's corporate stock to his previous two wives but not to Lynda is not indicative of Jerry's testamentary intent.  Indeed, at the evidentiary hearing, Humble acknowledged that his question about how a third marriage might impact the ranch's future referred to the possibility of a third divorce, not to Jerry's testamentary intent.

[¶58.]         Lastly, according to the majority opinion, Jerry and Lynda's decision to keep their real property under separate title is evidence of Jerry's intent that the transfer of other property was made in lieu of a testamentary provision.  However, SDCL 29A-2-301(a) does not contemplate whether the surviving spouse entered the marriage with property.  *See* 79 Am. Jur. 2d Wills § 529 ("A statute that provides that a will is revoked by a subsequent marriage of a testator who is survived by a spouse does not require that the surviving spouse bring any property to the marriage or that the marriage last for any specific length of time.").  Nothing in the record suggests that the transfers Jerry made were related to Lynda's property or

---

7.     At the time Lynda made the statement, there were many ways in which Lynda's statement could be accomplished: Lynda could have disclaimed any inheritance, she could hold the property and devise it to the grandchildren, or the property could be mortgaged with Lynda acquiring the value of an intestate share.

related to Jerry's and Lynda's decision to keep their real property separate. As such, their decision to maintain separate real property does not constitute other evidence that Jerry intended the transfers to Lynda to be in lieu of a testamentary provision.

[¶59.]    Because the record lacks any statements by Jerry regarding the intent of his transfers to Lynda and because his intent cannot be reasonably inferred from the amount of the transfers or other evidence, the Estate, as the proponent of the will, has failed to establish that it falls within the exception set forth in SDCL 29A-2-301(a)(3), and the circuit court erred as a matter of law in determining otherwise. For the foregoing reasons, I would reverse and remand.

[¶60.]    MYREN, Justice, joins this writing.